Gordon E. ALLEN, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee, Plaintiffs,

v.

WEST POINT–PEPPERELL, INC., D. Michael Roark, C. Powers Dorsett, and Barry F. Shea, Defendants.

No. 90 Civ. 3841 (SAS).

United States District Court,
S.D. New York.

Nov. 2, 1995.

---

Robert J. Hausen, Ralph A. Rossi, Chadbourne & Parke, New York City, for Plaintiffs, Gordon Allen, et al.

Francis Carling, Frederick A. Brodie, Mara Lozier Shore, Winthrop, Stimson, Putnam & Roberts, New York City, for Defendants West Point–Pepperell, Inc., et al.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Nine former executives of Cluett Peabody & Co. ("Cluett") bring this diversity action against West Point–Pepperell, Inc. ("West Point"), of which Cluett was once a subsidiary and division. Plaintiffs contend that West Point, in the face of a hostile takeover attempt, reduced the lump sum payments of deferred compensation due Plaintiffs under an employee benefit plan by wrongfully changing the discount rate applicable to those payments. Plaintiffs seek damages for breach of contract and fiduciary duty for West Point's failure to pay Plaintiffs their full deferred compensation benefits. Plaintiffs also state claims in connection with releases they executed in conjunction with their lump sum payments. They seek both damages, alleging that the releases were fraudulently induced, and rescission, alleging that the releases were the product of unilateral or mutual mistake. By Opinion and Order dated August 2, 1995 ("August 2 Opinion"), this Court granted in part and denied in part the parties' cross-motions for partial summary judgment on Plaintiffs' breach of contract and rescission claims.

### PLAINTIFFS' MOTION FOR REARGUMENT

■ Plaintiffs presently move, pursuant to Rule 3(j) of the Civil Rules of this Court, for leave to reargue the portion of the August 2 Opinion which denied them summary judgment with respect to the discount rate applicable to their lump sum payments. Plaintiffs' motion for reargument asserts, *inter alia*, that the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), governs the Court's interpretation of the contract terms at issue in this case. The Court did not address this possibility in its August 2, 1995 Opinion.[1] Upon reconsideration of the summary judgment motions, the Court finds that Plaintiffs are entitled to partial summary judgment on their contract claims. Accordingly, Plaintiffs' motion for reargument is granted. *See*

---

1. Although Plaintiffs mentioned the relevance of ERISA during oral argument and in correspondence to the Court, they relied largely on other grounds in making their motion and did not brief the ERISA issue in their summary judgment memoranda.

*Park South Tenants Corp. v. 200 Central Park South Assocs., L.P.,* 754 F.Supp. 352, 354 (S.D.N.Y.) (motion for reargument may be granted where court has overlooked matters which might have materially influenced earlier decision), *aff'd,* 941 F.2d 112 (2d Cir. 1991).

Because the Court: (1) must partially reverse the outcome of the August 2 Opinion; (2) finds, upon reconsideration of the motions in light of all relevant authority now brought to its attention, that portions of its prior analysis were erroneous; and (3) decided issues in the August 2 Opinion which no longer need be decided,[2] the Court hereby withdraws the August 2 Opinion. For the reasons stated in this Opinion and Order, Defendants' motion for partial summary judgment is denied, and Plaintiffs' motion for partial summary judgment is denied in part and granted in part.

### PARTIES' CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### BACKGROUND

The parties' submissions establish the following undisputed facts. *See generally* Statements Pursuant to Local Rule 3(g) ("3(g) Statements"). The Court has included specific citations to the record only in the few instances in which the parties' submissions raise issues of fact.

### A. *Parties*

The Plaintiffs are former executives of Cluett, a company which West Point acquired in 1986. West Point is a Georgia corporation which conducts business in textile, apparel and bed and bath products. Cluett was merged into West Point in January 1989 and operated as a division thereof until March 1990, when West Point sold Cluett to Bidermann Industries, Inc.

Defendant D. Michael Roark was Vice President of Human Resources for Cluett at all relevant times until 1986, and then Vice President of Human Resources for West Point until May 1989. At all relevant times, Defendant C. Powers Dorsett was West Point's Vice President, Secretary and General Counsel, and a member of the Cluett Retirement Plan Committee. He also served as a member of the Board of Directors of Cluett from January 1986 to December 1988. At all relevant times, Defendant Barry F. Shea was Assistant Treasurer and then Treasurer of West Point and a member of the Cluett Retirement Plan Committee.

### B. *Factual Background*

#### 1. *EPI Program*

In 1975, Cluett established for its senior executives an employee benefit program known as the Executive Permanent Insurance Program ("EPI Program"). The EPI Program consists of certain retirement and life and health insurance benefits, including a deferred compensation agreement which provides supplemental pension benefits. The Plaintiffs are participants in the EPI Program and are parties to a deferred compensation agreement under that program.[3]

#### 2. *EPI Program Amendment*

At its meeting of January 27, 1987, the Board of Directors of West Point ("West Point Board") decided to amend West Point's employee benefit plans (including the plans of its wholly-owned subsidiaries such as Cluett) to protect employee benefits in the event of a change in control of West Point. Thereafter, West Point sent the Plaintiffs an amendment, dated November 11, 1988, to the

---

**2.** The prior decision addressed (1) the Cluett Pension Committee's contractual authority to change the Cluett Pension Plan's discount rate and (2) the existence of a possible ambiguity in the Executive Permanent Insurance Program Amendment. The Court need not reach either of these issues under the analysis set forth in this Opinion.

**3.** The deferred compensation agreement requires Cluett to pay each participant, upon reaching age 65, monthly payments for the rest of his life equal, on an annual basis, to 30% of his highest annual salary. The agreement also requires Cluett to pay, upon each participant's death, monthly payments to the participant's spouse for the rest of her life equal, on an annual basis, to 15% of the participant's highest annual salary. This type of benefit is commonly referred to as a "joint and survivor benefit."

EPI Program ("EPI Amendment"). The Plaintiffs each executed the EPI Amendment, which provides that upon a "Change in Control" of West Point, each Plaintiff will receive the "Actuarial Equivalent" of his deferred compensation benefits in a single lump sum. The EPI Amendment defines "Actuarial Equivalent" in the following manner:

> The term "Actuarial Equivalent" means, with respect to ... Deferred Compensation ... [a] benefit provided under the terms of this Agreement which has the same present value as the Accrued Benefit. For the purpose of establishing whether a benefit is the Actuarial Equivalent of another benefit the actuarial assumptions contained in Cluett's Employee Retirement Plan shall be employed for so long as that Plan remains in existence and if such Plan is no longer in existence, the actuarial assumptions last used by such Plan shall be used.

Affidavit of Robert J. Hausen, attorney for Plaintiffs ("Hausen Aff."), Ex. E. ¶ 4A(1)(c) (EPI Amendment).

### 3. *The Cluett Pension Plan*

The parties agree that the Cluett Employee Retirement Plan ("Cluett Pension Plan," "Plan") was a defined benefit plan duly qualified under ERISA. The Plan document sets forth the following with respect to actuarial assumptions:

> "Actuarial Equivalent" means an amount of equal value when computed on the basis of interest, mortality and other tables as shall be adopted from time to time by the Committee on the advice of the Actuary, the current factors being as specified below:
>
> 1. *Mortality Table.* The 1978 GAM table (which is the 1971 Group Annuity Mortality Table projected to 1978 with Scale E). An average of male and female rates will be used.
> 2. *Interest Rate.* 5% per annum compounded annually.
> 3. *Other Factors.* None.

Hausen Aff.Ex. F § 1.3 (Cluett Pension Plan). Cluett amended the Pension Plan in 1983 to include this statement of the current applicable factors. Prior to 1983, Section 1.3

of the Plan consisted of the above-quoted language, absent the portion commencing, "the current factors being as specified below."

The Cluett Pension Plan gives the Cluett Committee the authority to "adopt" or "determine" the actuarial assumptions applicable to the Plan:

> [I]nterest, mortality and other tables ... shall be adopted from time to time by the Committee on the advice of the Actuary ...
>
> [The] decisions and the records of the Committee shall be conclusive and binding upon the Company, Participants, and all other persons having any interest under the Plan. The Committee ... shall determine from time to time the percentum rate or rates of interest to be used as the basis for calculations required in connection with the [Cluett Pension] Plan. As an aid to the Committee, the Actuary appointed by the Committee shall make annual actuarial valuations of the assets and liabilities of the [Cluett Pension] Plan and shall certify to the Committee the tables and rate or rates of interest which he would recommend for use by the Committee.

*Id.* §§ 1.3, 9.6.

The Cluett Pension Plan confers the right to "amend" the Plan to the Cluett Board of Directors ("Cluett Board"):

> The Board of Directors reserves the right at any time, and from time to time, to modify or amend in whole or in part any or all of the provisions of the [Cluett Pension] Plan, but no such amendment shall substantially change the rights to benefits which, prior to such amendment, have become fixed or matured by retirement, termination or death....

*Id.* § 11.1. The Plan also provides that the Cluett Board's amendment authority is exclusive: "The Company acting through the Board of Directors shall have the sole authority to ... amend or terminate, in whole or in part, the Plan...." Pls.' Comp. of Non–Case Auths. Cited in Pls.' Mem. in

Supp. of Mot. to Rearg. ("Pls.' Supp.Authorities") Ex. D § 9.1 (Cluett Pension Plan).[4]

### 4. *Change in Cluett Pension Plan Discount Rate*

In October 1988, a wholly-owned subsidiary of Farley Inc. ("Farley") commenced a tender offer for all of the shares of West Point. By no later than February 1989, Defendants decided to change the actuarial assumptions contained in the Cluett Pension Plan in order to change the discount rate used to calculate lump sums under the EPI Amendment. On or before February 16, 1989, Defendant Roark or Shea solicited from West Point's actuary, TPF & C, its opinion of the assumptions used in the Cluett Pension Plan. TPF & C recommended that West Point replace the Cluett Pension Plan's 5% discount rate with the rate used in West Point's pension plan. The West Point rate—calculated at 120% of the Pension Benefits Guaranty Corporation ("PBGC") immediate interest rate—was 9.3% during February and March 1989.

On February 16, 1989, the Cluett Pension Plan Committee (Cluett Committee) followed TPF & C's recommendations and decided to adopt the PBGC-based discount rate (then 9.3%) for the Cluett Pension Plan ("February 16, 1989 Committee Action").[5] The February 16, 1989 Committee Action is recorded in the Committee's minutes. The Cluett Committee acted with the intention of affecting the amount payable to participants in the EPI Program.

At all times relevant to this action, the interest rate printed in section 1.3 of the Cluett Pension Plan document was 5%. Neither the West Point Board nor the Cluett Board[6] ever voted to amend the actuarial assumptions used by the Cluett Pension Plan. Henry H. Henley, a West Point Board member, testified that an individual (whose identity Henley cannot recall) informed the West Point Board on February 23, 1989 that the Cluett Committee either had changed or was going to change the Cluett Pension Plan's actuarial assumptions. Defs.' 3(g) Statement Ex. 55 at 141–46 (Henry H. Henley Dep. Tr.). Henley did not object to the change and does not recollect any protest by other Board members. *Id.* at 145.

### 5. *Plaintiffs' Releases and Payout of Lump Sum Benefits*

By letter dated February 22, 1989, Defendant Roark informed the Plaintiffs that their lump sum EPI Program benefits would be calculated using the 9.3% PBGC-based discount rate:

> There has apparently been some confusion as to the method of calculation to be employed in determining the lump sum benefit under the Cluett Deferred Compensation Agreements. Some participants have told us that they were led to believe that a 5% discount rate would be used to determine lump sum values. This is incorrect. The formula under the Cluett Employee Retirement Plan which is referenced in the November 11, 1988, amendment calls for converting monthly annuities to lump sum amounts as follows:
>
> > "120% of the Pension Benefits Guaranty Corporation ("PBGC") immediate interest rate, unless the lump sum amount is less than $25,000. If the lump sum amount is less than $25,000 using the above rate, the lump sum is to be recal-

---

**4.** Although Plaintiffs' counsel mentioned this section during oral argument, Plaintiffs neither relied on the section in their summary judgment memoranda nor provided a copy of it to the Court in their summary judgment submissions.

**5.** Shea, Dorsett and others met on February 16, 1989 as West Point's Management Pension Committee. The West Point Management Pension Committee had, in 1988, been appointed by the Cluett Board of Directors to act as the Cluett Committee. *See* Declaration of Defendant C.

Powers Dorsett ¶ 3; Defs.' 3(g) Statement Ex. 23 (Jan. 4, 1988 Action of Cluett Board of Directors); *Id.* Ex. 22 ¶ 9.2 (Cluett Pension Plan) (authorizing Cluett Board of Directors to appoint members of Cluett Committee). Thus, Shea, Dorsett and the others acted as the Cluett Committee when they adopted the PBGC-based discount rate for the Cluett Pension Plan.

**6.** The Cluett Board ceased to exist when Cluett merged into West Point in January 1989.

culated using the PBGC immediate interest rate but the resulting lump sum is not to exceed $25,000.

> This formula has been adopted for all plans of WestPoint Pepperell and its subsidiaries which provide for lump sum payouts upon a change in control. The PBGC interest rate during February 1989 is 7-¾%, 120% of which is 9.3%."

Hausen Aff.Ex. Q (Feb. 22, 1989 letter, Roark to EPI Program Participants). Roark's letter appended an election form ("Election Form") which required the EPI Program participants to either (1) execute a release ("Release")[7] of West Point in order to obtain their lump sum benefit payments or (2) rescind the EPI Amendment. Each Plaintiff elected the lump sum payout and executed the Release of West Point.

By April 5, 1989, Farley completed its tender offer by acquiring more than 90% of West Point's shares. On that same day, each Plaintiff received a lump sum payment of his EPI Program deferred compensation benefits calculated on the basis of a 9.3% discount rate. West Point's use of the PBGC-based discount rate, rather than a 5% discount rate, reduced the amount payable to Plaintiffs under the EPI Amendment by over $1,000,000. Plaintiffs' checks were accompanied by a letter stating that "by cashing this check you acknowledge that the Company's obligation to make informal payments has been fully satisfied." Defs.' 3(g) Statement Ex. 38 (April 5, 1989 letter, Roark to EPI Program Participants). Each Plaintiff deposited his lump sum payout check without protest.

Defendants contend that at the time they solicited Plaintiffs' Releases and made the lump sum payments, they believed that the West Point Management Pension Committee had properly changed the discount rate applicable to the EPI Amendment from 5% to the 9.3% PBGC-based rate and that West Point was paying Plaintiffs all to which they were entitled.[8] The parties dispute whether any or all of the Plaintiffs believed, at the times they signed the Releases and accepted their lump sum payments, that the payments were properly calculated using the 9.3% PBGC-based rate and that they were receiving all to which they were entitled. *Compare* Pls.' 3(g) Statement ¶¶ 38, 40 and portions of the record cited therein *with* Defs.' Resp. to Pls.' 3(g) Statement ¶¶ 38, 40 and portions of the record cited therein.

In June 1989, West Point made a lump sum payment to employee Virginia Mansfield. This payment was West Point's first lump sum payment pursuant to section 13.2 of the Cluett Pension Plan for an employee retiring after February 16, 1989.[9] Section 13.2 authorizes the Plan Manager to direct lump sum, rather than monthly, payment of retirement benefits if such benefits are less than $100 per month. Hausen Aff.Ex. F § 13.2 (Cluett Pension Plan). Under this option, the Plan participant is paid the "actuarial equivalent" of his or her monthly benefits. *Id.* West Point used a 5% discount rate in calculating Mansfield's lump sum payment.

---

**7.** The release stated the following:

> I understand that, as a result of the [EPI Amendment] ..., I am entitled to receive in a lump sum payment the actuarial equivalent of my deferred compensation benefit under the [Deferred Compensation] Agreement. I understand that this lump sum will be calculated using a discount rate equal to 120% of the then current PBGC immediate interest rate ... I elect to have my deferred compensation benefit paid as a lump sum in the event of a change of control. I understand that the lump sum payment of the actuarial equivalent of my deferred compensation benefit will be in full satisfaction of all obligations of West Point–Pepperell, Inc., as successor to Cluett, Peabody & Co., Inc., under the terms of my Deferred Compensation Agreement, and that in accepting a lump sum

> payment I shall thereby release West Point–Pepperell, Inc., its directors, officers, employees, and agents, and its successors and assigns, from all obligations under the Agreement.

Hausen Aff.Ex. Q (Feb. 22, 1989 letter, Roark to EPI Program Participants).

**8.** Plaintiffs apparently accept these contentions for purposes of the parties' pending summary judgment motions. *See* Pls.' 3(g) Statement ¶¶ 37, 39.

**9.** Plaintiffs' April 5, 1989 payments were triggered by a change in control of West Point and made pursuant to the EPI Amendment. Mansfield's payout, on the other hand, was triggered by her retirement and made pursuant to the provisions of the Cluett Pension Plan.

### 6. Plaintiffs' Counsel and Delay in Seeking Rescission

Robert D. Krumme was employed by Cluett from 1969 to the beginning of 1986, when West Point acquired Cluett. At the time of his termination, Krumme was Cluett's Vice President and General Counsel. On March 24, 1989, Krumme filed a lawsuit against West Point, contending that West Point should have calculated lump sum payments under the EPI Amendment on the basis of a 5% discount rate, rather than the 9.3% PBGC-based date. Between April and September 1989, Krumme contacted the Plaintiffs to discuss their potential claims and the possibility of their retaining him as counsel. By September 1989, each of the Plaintiffs was aware of Krumme's theory that the Defendants' change of the discount rate was improper. By September 1989, each of the Plaintiffs except Currier and Mandry had signed a retainer agreement with Krumme. Plaintiffs Currier and Mandry signed retainer agreements with Krumme in March and May 1990, respectively.

Krumme hired Robert Hausen of Chadbourne & Parke as Plaintiffs' trial counsel. Krumme and/or Hausen decided, without any participation by the Plaintiffs, to file the complaint in the instant action on June 6, 1990. Prior to the filing of this lawsuit, none of the Plaintiffs ever sought to revoke, rescind, or repudiate their Releases. Each of the Plaintiffs failed to answer a number of questions at their depositions due to difficulties with memory. Before and during the pendency of an earlier appeal to the Second Circuit, Hausen failed to disclose to the Second Circuit and to Defendants that he was representing Plaintiffs at the request of Krumme, and that Krumme was Plaintiffs' counsel.

### 7. Interest on Any Award Pursuant to the EPI Amendment

The EPI Amendment provides that upon a change of control of West Point, each Plaintiff must receive his lump sum payment within 60 days of the Change in Control Date.[10] The parties agree that Plaintiffs' lump sum payments were due no later than May 30,

1989. The EPI Amendment provides for interest of 2% over the Manufacturers Hanover reference rate on overdue lump sum payments. Manufacturers Hanover merged with Chemical Bank in July 1991, at which time the Manufacturers Hanover reference rate became the Chemical Bank prime rate.

### 8. Attorney's Fees Pursuant to the EPI Amendment

The EPI Amendment provides the following with respect to West Point's payment of attorney's fees in connection with disputes arising under the amendment:

> If at any time upon or after a Change of Control there should arise any dispute as to the validity, interpretation or application of any term or condition of this Agreement, ... Cluett agrees, upon written demand by an Executive, to provide sums sufficient to pay on a current basis (either directly or by reimbursing the Executive or his legal representative) the Executive's costs and reasonable attorneys' fees (including expenses of investigation and disbursements for the fees and expenses of experts, etc.) (a) incurred by the Executive in connection with any dispute or litigation, regardless of whether the Executive is the prevailing party, involving any provision of this Agreement, provided that the court in which such litigation is pursued determines, upon application of any party, that the Executive or his legal representative did not initiate frivolously such litigation.

Hausen Aff.Ex. E ¶ 16 (EPI Amendment).

### 9. Joint and Survivor Factor Used in Calculating Payments

In calculating the lump sum amount due to each Plaintiff, West Point's actuary included the present value of the Plaintiff's joint and survivor benefit. Because of the February 16, 1989 Committee Action, West Point's actuary used a West Point joint and survivor factor of approximately .95, rather than the joint and survivor factor printed in the Cluett

---

**10.** The Change in Control Date is defined in the EPI Amendment as the end of West Point's fiscal month preceding the occurrence of a Change in Control.

Pension Plan.[11] According to Plaintiffs,[12] the use of the West Point joint and survivor factor rather than the Cluett factor decreased the lump sum payments made to certain of the Plaintiffs.

### 10. *Early Retirement Assumption Used in Calculating Payments*

The EPI deferred compensation agreement provides that a participant may receive annuity-type benefits on or after reaching age 55, but at a reduction of ½ of 1% for each month the participant is less than 65 years of age. In calculating the EPI Program lump sum benefits, West Point's actuary automatically reduced the annuity-type payment (upon which the lump sum was calculated) by ½ of 1% for each month any Plaintiff was less than 65 years of age, with a maximum reduction of 60% for those age 55 or younger. West Point's actuary made the early retirement assumption because doing so produced the largest lump sum benefit for each participant on the basis of the actuarial assumptions used.

### C. *Procedural History*

Plaintiffs filed their complaint on June 6, 1990. On August 3, 1990, Defendants moved to dismiss the complaint, contending that Plaintiffs' Releases barred their claims. The district court (Conboy, J.) dismissed the complaint on January 25, 1991. The Second Circuit subsequently reversed the district court's decision, holding, *inter alia,* that "[t]he facts as alleged in the complaint implicate the necessary elements for rescission based on mutual mistake." *Allen v. West-Point–Pepperell, Inc.,* 945 F.2d 40, 46 (2d Cir.1991).

### DISCUSSION [13]

Plaintiffs move for summary judgment on their rescission and breach of contract claims.[14] Under the former claim, Plaintiffs contend that because the parties believed that the discount rate applicable to the EPI Amendment had been properly changed, Plaintiffs' Releases were the product of mutual mistake, and, thus, should be rescinded. Under the latter claim, Plaintiffs allege that the Cluett Committee lacked the power under ERISA [15] to change the actuarial assumptions contained in the Cluett Pension Plan.[16] According to Plaintiffs, such a change could only be made pursuant to a formal amendment by the Cluett Board, and, thus, the February 16, 1989 Committee Action did not alter the Cluett Pension Plan's discount rate. As a result, Defendants allegedly breached the terms of the EPI Amendment by calculating Plaintiffs' lump sum benefits on the basis of the PBGC-based interest rate rather than the 5% rate printed in the Cluett Pension Plan document.

The Defendants cross-move for summary judgment on Plaintiffs' rescission claim, contending that Plaintiffs' delay in bringing this suit bars such relief. Defendants also cross-move for summary judgment on the breach of contract claim, asserting that the Febru-

---

**11.** The Cluett Pension Plan contained a joint and survivor factor of .9 increased or decreased by .005 for each year in excess of five that a beneficiary's (*i.e.,* spouse's) age was greater or lesser than a participant's.

**12.** The Court is unable to determine from Defendants' response to paragraph 57 of Plaintiffs' 3(g) Statement, *see* Defs.' Resp. to Pls.' 3(g) Statement ¶ 57, whether Defendants dispute the portion of Plaintiffs' assertion included herein. Because the assertion is not dispositive of any pending matter, the Court assumes its validity solely for purposes of this motion.

**13.** The parties agree that New York law applies to this diversity action.

**14.** Plaintiffs also move for summary judgment on a variety of subsidiary issues.

**15.** Plaintiffs also claim that the Cluett Committee lacked such authority under the terms of the Cluett Pension Plan. Because Plaintiffs' ERISA argument is persuasive, the Court need not, and does not, reach Plaintiffs' contentions with respect to the terms of the Cluett Pension Plan.

**16.** In moving for reargument, Plaintiffs now direct their ERISA analysis to the August 2 Opinion's interpretation of the terms of the EPI Amendment. Plaintiffs previously aimed their ERISA analysis at the question of whether the Cluett Pension Committee had authority to change the terms of the Cluett Pension Plan. *See* letter from Robert J. Hausen to the Court, dated May 3, 1995, at 2 n.*; Mar. 14, 1995 Oral Arg.Tr. at 11. Plaintiffs' earlier formulation better presented the issue that must be resolved.

ary 16, 1989 Committee Action validly changed the discount rate applicable to lump sum benefits paid under the EPI Amendment.

## I. *SUMMARY JUDGMENT STANDARD*

■ To prevail on summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). All disputed facts will be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Suburban Propane, a Div. of Nat. Distillers and Chemical Corp. v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). A party moving for summary judgment on a claim as to which the nonmoving party bears the burden of proof at trial may demonstrate the absence of a genuine issue of material fact by showing that the nonmoving party lacks evidence to support an essential element of his or her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to present specific facts establishing that there is a genuine issue to be decided at trial. Fed. R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

## II. *PROMPTNESS*

■ Defendants argue that the Plaintiffs' delay in asserting their entitlement to rescission of the Releases bars their assertion of such a claim in this suit. Defendants rely on the general New York rule that "an action for rescission must be initiated without un-

reasonable delay." *Allen*, 945 F.2d at 47 (citing *Schenck v. State Line Tel. Co.*, 238 N.Y. 308, 313, 144 N.E. 592 (1924)). *See also Grymes v. Sanders*, 93 U.S. 55, 62, 23 L.Ed. 798 (1876) (a party seeking rescission "upon the ground of mistake or fraud ... must, upon discovery of the facts, at once announce his purpose, and adhere to it ... He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted"). This is particularly true where the disputed contract involves speculative property, i.e., property "liable to large and constant fluctuations in value." *Grymes*, 93 U.S. at 62 (involving sale of purportedly gold-bearing land). As Defendants correctly note, this "promptness requirement" is not a defense, but an element of plaintiff's case which, unlike the defense of laches, demands no showing of prejudice.[17] *Banque Arabe Et. Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F.Supp. 1199, 1211 and n. 6 (S.D.N.Y.1994), *aff'd*, 57 F.3d 146 (2d Cir.1995); John M. Friedman, *Delay as a Bar to Rescission*, 26 Cornell L.Q. 426 at 428 (1941) (*"Delay as a Bar to Rescission"*).[18]

The parties do not dispute that by September 1989, Krumme had discussed his theory of the impropriety of the lump sum payments with the Plaintiffs, and each Plaintiff had retained Krumme to represent him with respect to those payments. Despite the Plaintiffs' knowledge of the basis for their claims, however, they did not commence this suit until June 1990 and took no action prior to that time to notify the Defendants of their intent to rescind. Thus, at a minimum, Plaintiffs delayed well over nine months before giving Defendants notice of their intent to rescind. Krumme attributes this delay to his involvement in pursuing his own suit,

---

17. Although they claim that they are not asserting a laches defense, Defendants argue that Plaintiffs' nine month delay in commencing this action prejudiced them by permitting the diminution of witness memories and the availability of relevant records. Defendants' claim of prejudice is unconvincing in light of Defendants' failure to notice Plaintiffs' depositions or request document discovery until nearly two and one-half years after Plaintiffs commenced this action.

18. Plaintiffs allege that Defendants are barred by their "unclean hands" from raising any equitable defenses in this case. Plaintiffs base their argument on the allegation that defense counsel "conceal[ed] ... the April 24, 1989 5% lump sum calculation for Virginia Mansfield and ... produc[ed] ... a false May 11, 1989 PBGC-based calculation in its stead." Pls.' Mem. in Opp. at 24. Because the promptness requirement is an element of Plaintiffs' case, not an equitable defense, the Court need not reach Plaintiffs' allegation of "unclean hands."

obtaining and preparing trial counsel, and drafting a complaint.

■ The Plaintiffs counter that an exception to the general rule of promptness applies to this case. Certain New York courts have held that a party seeking to rescind a contract need not demonstrate promptness if he or she does not possess property that must be returned in the event of rescission. *Wolf v. Nat'l City Bank of N.Y.*, 170 A.D. 565, 156 N.Y.S. 575, 579 (1st Dep't 1915) (where party sought to rescind a note for which he received nothing of value, court declined to require prompt notice and stated that "we are cited to no case ... holding that ... notice [of rescission] is necessary in a case like the present, where there is nothing to be returned to the party against whom the rescission is claimed"); *Marin v. Francisca Reyes, Inc.*, 147 Misc. 136, 262 N.Y.S. 577, 578 (Sup.Ct.N.Y.Co.1931), *aff'd mem.*, 238 A.D. 779, 262 N.Y.S. 579 (1st Dep't 1933), *aff'd mem.*, 263 N.Y. 550, 189 N.E. 692 (1933) (purchaser of painting who sought rescission of contract of sale need not provide notice of rescission as he never took possession of the picture); *In re Tagliabue's Estate*, 123 Misc. 666, 206 N.Y.S. 222, 224 (Sur.Ct.1924) (following *Wolf*). *See also Delay as a Bar to Rescission, supra* at 434–36 ("[t]he rule of promptness ... seems to have been relaxed greatly" where the "rescinding party has received nothing of value from the defending party, or where there is nothing to tender back") (footnotes omitted); Walter H.E. Jaeger, *Williston on Contracts* (3d ed. 1970) § 1469 at 201–06 (prompt notice of election

to rescind probably only necessary "where the party seeking rescission has received money or property which he must restore as a condition of relief, or where there is further performance due under the contract from the other party which in the absence of notice he might suppose would be accepted in spite of his prior breach") (footnotes omitted).[19]

■ Plaintiffs argue that the above-mentioned exception applies to this case because Plaintiffs have nothing to return to Defendants in the event of rescission. The EPI Amendment entitles Plaintiffs to lump sum benefit payments upon a "Change in Control." The February 22, 1989 Election Forms and Plaintiffs' Releases give Plaintiffs no rights or benefits not already conferred on them by the EPI Amendment, and the parties do not dispute that Plaintiffs are entitled under the EPI Amendment to at least as much money as they received in the April 5, 1989 payments. Accordingly, Plaintiffs received nothing of value under the Releases which would be returnable in the event of rescission.

■ Defendants attempt to avoid this exception by arguing that it is absent from modern case law.[20] A federal court sitting in diversity is not bound by old state law decisions if the Court is convinced by persuasive data that the highest court of the state would decide otherwise. *Boniuk v. New York Medical College*, 535 F.Supp. 1353, 1357–58 (S.D.N.Y.1982), *aff'd mem.*, 714 F.2d 111 (2d Cir.1982) (quoting *West v. American Teleph. & Teleg. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)). No case to which

**19.** The absence of returnable property justifies the exception to the promptness requirement because in such a case "there is involved no restoration of the *status quo ante* except for a declaration that certain contractual rights and duties are voided." *Delay as a Bar to Rescission* at 448.

**20.** Defendants also argue that the applicability of the promptness requirement is the law of this case. This Court disagrees. Defendants raised Plaintiffs' delay to the Second Circuit, which remanded for further proceedings, stating that "[a]n action for rescission must be initiated without unreasonable delay." *Allen*, 945 F.2d at 47. The excerpts of the appellate briefs in the record, however, indicate that the parties did not present the Court of Appeals with the possibility of an applicable exception to the promptness requirement. Hausen Resp.Aff.Ex. N at 17–19 (Defs.'

App.Brief); *Id.* Ex. O at 16–18 (Pls.' App.Rep. Brief). Instead, Plaintiffs argued that the reasonableness of their delay could not be determined on the available record. *Id.* Ex. O at 18 (Pls.' App.Rep.Brief). The Court of Appeals apparently agreed with this argument, concluding that "[a]t this point in the litigation ... there is little evidence probative of the reasonableness of any delay in bringing this action." *Allen*, 945 F.2d at 47. Accordingly, the Second Circuit did not determine whether the promptness requirement should apply to this case in which the parties seeking relief need not return any property in the event of rescission. *See e.g. Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed.Cir.1991) (trial court is not constrained "with respect to issues not actually decided by an appellate court").

Defendants cite, however, even addresses the exception advanced by Plaintiffs, let alone finds it inapplicable or unpersuasive. Further, for the reasons explained below, the recent judicial silence on the issue does not eliminate the exception.

First, certain of the cases cited by Defendants are inapplicable to the issue at hand. *See e.g. Johns Hopkins Univ. v. Hutton,* 488 F.2d 912, 917 (4th Cir.1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 1623, 40 L.Ed.2d 118 (1974) (no application of New York law and case involved speculative property); *Baumel v. Rosen,* 412 F.2d 571, 574 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681 (1970) (same); *Dalessandro v. Monk,* 1988 WL 42136, *2, 1988 U.S.Dist. LEXIS 3511, 7 (S.D.N.Y. Dec. 14, 1988) (plaintiff did not seek rescission, and although prompt notice was given, plaintiff waived objections to contract by accepting benefits thereunder); *Gamble v. Cornell Oil Co.,* 154 F.Supp. 581, 586–87 n. 15 (W.D.Okl. 1957), *aff'd,* 260 F.2d 860 (10th Cir.1958) (plaintiffs never sought rescission of contract); *New York Tel. Co. v. Jamestown Tel. Corp.,* 282 N.Y. 365, 371–73, 26 N.E.2d 295 (1940) (court addressed sufficiency of notice under contract terms, not promptness rule).

Second, many of the cases cited by Defendants involve property (or some other object of value) returnable upon rescission. *See e.g. Grymes,* 93 U.S. at 62; *Dalessandro,* 1988 WL 42136 at *2, 1988 U.S.Dist. LEXIS at 7; *In re Domestic Fuel Corp.,* 79 B.R. 184, 196 (Bankr.S.D.N.Y.1987); *Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.,* 184 F.Supp. 116, 118 (S.D.N.Y.1959), *aff'd,* 274 F.2d 805 (2d Cir.1960), *cert. denied,* 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727

(1960); *88 Blue Corp. v. Reiss Plaza Assocs.,* 183 A.D.2d 662, 585 N.Y.S.2d 14, 16 (1st Dep't 1992); *Gannett Co., Inc. v. Register Pub. Co.,* 428 F.Supp. 818, 826 (D.Conn. 1977); *Faske v. Gershman,* 30 Misc.2d 442, 215 N.Y.S.2d 144, 148 (Mun.Ct.Bo.Manh. 1961); *Sy–Jo Luncheonette, Inc. v. Marsav Distributors, Inc.,* 279 A.D. 715, 108 N.Y.S.2d 349, 351 (1st Dep't 1951), *aff'd,* 304 N.Y. 747, 108 N.E.2d 614 (1952). Further, in a number of Defendants' cases, the courts explicitly found an absence of any grounds for rescission and, thus, did not need to reach the question of whether a lack of promptness, absent any prejudice, precludes rescission by a party that can assert a valid ground for such relief. *See, e.g., Grymes,* 93 U.S. at 62; *Banque Arabe,* 850 F.Supp. at 1215–26; *In re Domestic Fuel Corp.,* 79 B.R. at 195; *88 Blue Corp.,* 585 N.Y.S.2d at 16; *Powell v. Oman Const. Co.,* 25 A.D.2d 566, 267 N.Y.S.2d 862, 864 (2d Dep't 1966); *Jerrose Management Corp. v. Garnett,* 33 Misc.2d 307, 226 N.Y.S.2d 503, 506–08 (Sup.Ct. N.Y.Co.1962); *Faske,* 215 N.Y.S.2d at 148; *Sy–Jo Luncheonette,* 108 N.Y.S.2d 349, 351.[21]

In short, the Defendants have cited to no analogous case, and the Court is aware of none, in which a court applying New York law used the promptness requirement as the sole basis for denying rescission to a party possessing nothing of value that would be returnable in the event of rescission. Thus, Defendants have failed to present the Court with persuasive authority indicating that the New York Court of Appeals would not recognize the propounded exception to the promptness requirement. Accordingly, the Court applies that exception, rather than the promptness requirement, to this case.[22]

---

**21.** Defendants cite to only one case in which (1) rescission may not have required the return of property and (2) the Court did not find an absence of grounds for rescission as a matter of law. *Port Chester Elec. Construction Corp. v. Hastings Terraces, Inc.,* 284 A.D. 966, 134 N.Y.S.2d 656, 658 (2d Dep't 1954). That case, however, is inapposite because the party seeking rescission affirmed the contract by repeatedly failing to raise its duress defense until after filing both an answer and amended answer. *Id.*

**22.** For the reasons stated, the Court need not determine whether Plaintiffs gave prompt notice of their intent to rescind. Nonetheless, to avoid

an unnecessary remand of this suit, the Court will make such a finding. To satisfy the promptness requirement, a party seeking to rescind must give notice of his or her intentions within a "reasonable" period of time, *Allen,* 945 F.2d at 47. The court determines whether the time period is reasonable by examining the particular facts of the case. *Delay as a Bar to Rescission, supra* at 448. Under these standards, and in the circumstances of this case, the Plaintiffs' delay of more than nine months in notifying the Defendants of their intent to rescind was clearly not reasonable and, thus, not prompt.

## III. *BREACH OF CONTRACT*

The parties' cross-motions for summary judgment on Plaintiffs' breach of contract claim turn upon a determination of what rate was "contained in" the Cluett Pension Plan after the February 16, 1989 Committee Action. At all relevant times, the Cluett Pension Plan *document* contained a discount rate of 5%, and the Cluett Board *never voted to amend* that rate. Nonetheless, Defendants contend that the February 16, 1989 Committee Action changed the discount rate contained in the Plan from 5% to the PBGC-based rate. Plaintiffs counter that the February 16, 1989 Committee Action was ineffective under ERISA to change the terms of the Cluett Pension Plan.[23]

As a preliminary matter, Defendants argue that Plaintiffs' ERISA analysis is flawed because: (1) the EPI Program was a "top-hat" plan exempt from the ERISA requirements ordinarily applicable to employee benefit plans; and (2) Plaintiffs pled no claim under ERISA, and any such claim would now be barred by the applicable statute of limitations. Defendants arguments are unpersuasive. Plaintiffs do not contend that ERISA's requirements *directly* govern the EPI Amendment. Rather, Plaintiffs correctly note that those requirements *indirectly* affect the EPI Amendment because they govern the terms of the Cluett Pension Plan. Similarly, Plaintiffs do not pursue a claim or remedy under ERISA, but simply argue that ERISA's requirements are relevant to interpreting the terms of the Cluett Pension Plan and EPI Amendment. Thus, Plaintiffs' ERISA analysis is relevant to the Court's determination of the parties' motions.

**23.** Plaintiffs also argue that even if the February 16, 1989 Committee action changed the rate applicable to the Cluett Pension Plan, the new rate only applied to benefits accrued after that change. Because the Court finds in Plaintiffs' favor on their first argument, it need not and does not, reach this "split rate" issue.

**24.** ERISA provides beneficiaries with certain safeguards in connection with the amendment of benefit plans. For example, the statute requires pre- and post-amendment notification to affected beneficiaries of significant reductions in the rate of future benefit accrual, 29 U.S.C. § 1054(h), and prohibits retroactive decreases in accrued benefits, 29 U.S.C. § 1054(g).

■ ERISA requires that "[e]very employee benefit plan ... be established and maintained pursuant to a written instrument" and "specify the basis on which payments are made ... from the plan." 29 U.S.C. §§ 1102(a)(1), (b)(4). The purpose of the written document requirement is to allow an employee "*on examining the plan documents,* [to] determine exactly what his rights and obligations are under the plan." *Curtiss–Wright Corporation v. Schoonejongen,* — U.S. —, —, 115 S.Ct. 1223, 1230, 131 L.Ed.2d 94, 103 (1995) (quoting H.R.Rep. No. 93–1280, p. 297 (1974) U.S.Code Cong. & Admin.News 1974 pp. 4639, 5077, 5078) (emphasis added by quoted case).

■ ERISA also requires that every benefit plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan...." 29 U.S.C. § 1102(b)(3).[24] The Cluett Pension Plan explicitly states that "[t]he Board of Directors reserves the right ... to ... amend ... the [Cluett Pension] Plan." Hausen Aff.Ex. F § 11.1 (Cluett Pension Plan). The Cluett Pension Plan also specifies that the Cluett Board's amendment authority is exclusive: "The Company acting through the Board of Directors shall have the sole authority to ... amend or terminate, in whole or in part, the Plan...." Pls.' Supp.Authorities Ex. D § 9.1 (Cluett Pension Plan). These clauses adequately identify both the persons capable of amending the Plan—i.e., the Cluett Board—and the procedure for making such an amendment—i.e., a decision to amend by the Cluett Board. *Curtiss–Wright,* — U.S. at — – —, 115 S.Ct. at 1228–29, 131 L.Ed.2d at 102–03.[25]

**25.** Defendants cannot argue that the Cluett Committee possesses any "amendment" authority as that term is used in the Plan. Such authority is unambiguously and exclusively granted to the Cluett Board. Pls.' Supp. Authorities Ex. D § 9.1 (Cluett Pension Plan); Hausen Aff.Ex. F § 11.1 (Cluett Pension Plan). Defendants could argue, however, that the Plan's and ERISA's use of the term "amendment" are not synonymous and that the Plan sufficiently defines, for purposes of ERISA, the Cluett Committee as the amending authority, and the Cluett Committee's decisions as the amending procedure, with respect to actuarial factors. This argument is unavailing. The Plan's explicit grant of exclusive "amendment" authority to the Cluett Board ren-

■ Under ERISA, a change in the terms of a benefit plan is only valid if made in writing pursuant to the amendment procedure and by the amending authority set forth in the benefit plan. *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58–59 (4th Cir. 1992) (modifications to a plan must be in writing and in conformity with formal amendment procedures), *cert. denied*, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993); *Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1453–1454 (4th Cir.1992) (Wilkinson, J., concurring) ("written modification must be adopted in conformity with the amendment procedures set out in the plan in order to have effect"); *Alday v. Container Corp. of America*, 906 F.2d 660, 665 (11th Cir.1990) (a plan cannot be changed by an oral or informal written amendment), *cert. denied* 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991); *Washington Nat. Ins. Co. v. Hendricks*, 855 F.Supp. 1542, 1556–57 (W.D.Wis.1994) (a writing that does not comply with the amendment procedures of the plan cannot become part of the plan). Because the Plan sets forth an amendment procedure that may only be utilized by the Cluett Board, the Cluett Committee had no authority under ERISA to change the terms of the Plan.

■ The Court's conclusion in this respect arguably renders meaningless the Plan's grant of authority to the Cluett Committee to adopt actuarial factors from time to time. That authority was not without substance when first granted, however. Prior to 1983, the Cluett Plan document did not set forth the factors currently applicable under the Plan, but simply defined the factors as those adopted by the Committee. Thus, prior to 1983, the Cluett Committee could change the Plan's actuarial factors simply by adopting new ones, without amending any of the terms of the original Plan document. Such an adoption would probably not have constituted an amendment of the Plan under ERISA. *See, e.g., Stewart v. National Shopmen Pension Fund*, 730 F.2d 1552, 1563 (D.C.Cir.), *cert. denied*, 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984) (mere exercise of a plan provision held not an amendment for certain ERISA purposes); *Dooley v. American Airlines, Inc.*, 797 F.2d 1447, 1450–52 (7th Cir.1986), *cert. denied*, 479 U.S. 1032, 1087, 107 S.Ct. 879, 1292, 93 L.Ed.2d 833, 94 L.Ed.2d 149 (1987) (where (1) plan provided that employer could approve actuarial factors from time to time, (2) employer approved certain actuarial factors pursuant to the plan provision, and (3) employer later approved new factors, latter action was not an amendment of the plan). Accordingly, it was not until Cluett's 1983 addition of the current actuarial factors that the Plan presented a possible conflict between the Cluett Board's and Cluett Committee's authority. The Court, presented with that conflict, reads the Plan in the manner which complies with ERISA's requirement that changes only be made pursuant to a defined amendment procedure by a defined amending authority.

The Cluett Board undisputedly did *not* act to amend the Cluett Pension Plan.[26] Accord-

ders any other purported grant of such authority hopelessly ambiguous. Such an ambiguous delegation is completely at odds with (1) ERISA's requirement that benefit plans be maintained pursuant to written instruments which identify the plan's amendment authority and procedure, 29 U.S.C. §§ 1102(a)(1), (b)(3), and (2) the writing requirement's purpose of enabling beneficiaries to "determine exactly" what their rights are under the plan by examining the plan documents, *Curtiss–Wright,* —— U.S. at ——, 115 S.Ct. at 1230, 131 L.Ed.2d at 103. Accordingly, the Court finds that the Plan does not adequately define, under the requirements of ERISA, the Cluett Committee as the amending authority with respect to actuarial factors.

**26.** Mr. Henley's testimony regarding the Cluett Board's acquiescence in the change fails to raise a genuine issue of material fact in this respect. *See* Defs.' 3(g) Statement Ex. 55 at 141–46 (Henry H. Henley Dep. Tr.). As a preliminary matter, Mr. Henley could not remember whether the West Point Board had been informed of the Cluett Committee's attempt to adopt a new discount rate *before* or *after* the Committee's action. Further, Mr. Henley did not testify that the Cluett Board amended the Cluett Pension Plan in accordance with the Cluett Committee's action or that the Cluett Board took any other steps to adopt the Cluett Committee's action. He simply testified that he did not object to the news and recalls no objection of other Cluett Board members. The Court does not believe that the Cluett Board's failure to object to notice of the Cluett Committee's adoption of a new discount rate constitutes a decision or action to amend the Cluett Pension Plan. In addition, Defendants have produced no Board meeting minutes re-

ingly, the 5% discount rate printed in the Cluett Pension Plan was never validly changed and was at all relevant times one of the actuarial assumptions "contained in" the Cluett Pension Plan for purposes of the EPI Amendment.[27]

## IV. *MUTUAL MISTAKE*

The mistake which Plaintiffs argue vitiates their releases is "the parties mutual lack of awareness that, under the EPI Amendment, [Plaintiffs] were entitled to a lump sum amount calculated at a 5% discount rate." *Allen*, 945 F.2d at 46. The Defendants contend that at the time they solicited Plaintiffs' Releases and made the EPI lump sum payments, they believed that the February 16, 1989 Committee Action had changed the applicable discount rate to the 9.3% PBGC-based rate. Plaintiffs argue that their own mistaken belief "inevitably follows" from that of the Defendants' "since [P]laintiffs' mistake was caused by, and is completely derivative of, West Point's mistake." Pls.' Mem. in Supp. at 22. Plaintiffs claim that their mistaken belief was induced by Roark's letter to the Plaintiffs, which stated that the 9.3% PBGC-based rate, not a 5% rate, would be used in calculating lump sum values. Hausen Aff.Ex. Q (Feb. 22, 1989 letter, Roark to EPI Program Participants).

As a preliminary matter, Defendants oppose Plaintiffs' mutual mistake claim on the grounds that the parties' alleged mistake could easily have been discovered when Plaintiffs were first notified of the PBGC-based rate. *See DaSilva v. Musso*, 53 N.Y.2d 543, 551, 444 N.Y.S.2d 50, 428 N.E.2d 382 (1981) (*quoting Grymes*, 93 U.S. at 61) (rescission on the basis of mistake unavailable "where the means of knowledge were easily accessible"). Defendants' argument must be rejected. Contrary to Defendants' contention, Defs.' Mem. in Opp. at 16, the issue dispositive of Plaintiffs' mistake claim is

not whether the Cluett Board voted to change the Plan's discount rate, but whether Cluett validly changed that rate absent such a vote. The Court's resolution of this issue has required a complicated legal analysis of the EPI Amendment, the Cluett Pension Plan, and the requirements of ERISA. Further, Plaintiffs' mistake was allegedly based, at least in part, on representations by Defendants that Cluett had validly changed the rate. Thus, Defendants have failed to provide any evidence that "the means of knowledge were easily accessible" to Plaintiffs.

 Plaintiffs' awareness of their entitlement to a lump sum payment based on the 5% discount rate is, however, an issue of fact inappropriate for summary judgment disposition. "In light of the court's obligation to draw all reasonable inferences against the nonmoving party, summary judgment is rarely appropriate where the moving party's state of mind is a material issue." *Equal Employment Opportunity Comm'n v. Home Ins. Co.*, 672 F.2d 252, 257 (2d Cir.1982). *See also* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2730 at 238 (2d ed. 1983) (summary judgment on state of mind is often inappropriate because such a determination "usually entails the drawing of factual inferences as to which reasonable [persons] might differ—a function traditionally left to the jury . . ."). Further, contrary to Plaintiffs' assertions, Pls.' 3(g) Statement ¶¶ 38, 40, their submissions do not establish as a matter of law that each of the Plaintiffs believed, at the time he executed his Release and accepted his lump sum payment, that such payment was properly calculated on the basis of a 9.3% discount rate and that he was receiving all to which he was entitled. *See, e.g.,* Hausen Aff. Ex EE at 29–30, 48 (Currier Dep.); *Id.* Ex. FF (Dunne Dep.) at 42–43, 55–56; *Id.* Ex. GG at 53–54, 73 (Fornero Dep.); *Id.* Ex. KK at 75, 100 (Pallota Dep.).

flecting the discussion Mr. Henley describes. Pls.' Resp. to Defs.' 3(g) Statement ¶ 64. Thus, even if the Board's lack of protestation could constitute a decision to amend, that amendment would fail to satisfy the requirement that amendments be in writing. *Coleman*, 969 F.2d at 58–59.

27. The term "contained in" the Cluett Pension Plan is arguably subject to different interpretations. Under no reasonable interpretation, however, could a rate other than 5% be "contained in" the Cluett Pension Plan if the February 16, 1989 Committee Action did not validly change the terms of that Plan.

Accordingly, Plaintiffs' claim for rescission on the grounds of mutual mistake presents material issues of fact which must be resolved by the fact finder.

## V. *JOINT AND SURVIVOR AND EARLY RETIREMENT FACTORS*

The EPI Program provides for a joint and survivor benefit—a benefit paid monthly to the participant for his life, and 50% of that benefit paid to the participant's spouse for her life after the participant's death. Thus, to determine the amount of each Plaintiff's lump sum payment, West Point had to ascertain the actuarial equivalent of future payments to the participant's spouse as well as to each participant. To do so, the actuary divided each participant's benefit by a "joint and survivor factor." In calculating Plaintiffs' lump sum payments, West Point's actuary used a joint and survivor factor of .95 taken from the West Point Pension Plan, rather than the .9 joint and survivor factor printed in the Cluett Pension Plan. The actuary believed that the February 16, 1989 Committee Action made the West Point assumptions applicable to the Cluett Pension Plan. Plaintiffs contend that "[i]f this Court finds that the committee's action was ineffective to change the assumptions applicable to the November 11, 1988 EPI Amendment, then ... a Cluett joint and survivor factor should be used to calculate the appropriate lump sum benefit." Pls.' Mem. in Supp. at 19.

In calculating Plaintiffs' lump sum payments, West Point's actuary also assumed that each participant would elect the EPI's early retirement option, which allowed participants to receive their monthly benefits prior to age 65 at a reduction of ½ of 1% for each month before age 65 that he began receiving benefits. The actuary assumed the participants' election of the early retirement reduction because the option was favorable to the participants under the actuarial assumptions used. Plaintiffs contend that "if this Court finds a 5% discount rate applicable, it should also hold that the early retirement factor should not be applied to the extent it may reduce the lump sum benefits due any of the plaintiffs." Pls.' Mem. in Supp. at 20.

■ Defendants argue that Plaintiffs' joint and survivor and early retirement factor claims are not properly before the Court because they are outside the scope of Plaintiffs' complaint. Defendants contend that "[a]t *no* time during the past five years did [P]laintiffs provide West Point with any notice that the joint and survivor factors or the early retirement factors were in issue." Defs.' Mem. in Opp. at 17 (emphasis in original). Plaintiffs do not claim to have provided West Point with such notice. A motion for summary judgment is not the appropriate place to present new claims which effectively amend the complaint. *See Coppola v. Connecticut Student Loan Found.*, 1989 WL 47419, *3 n. 14 (D.Conn. Mar. 2, 1989) (Cabranes, J.). Accordingly, Plaintiffs' motion for summary judgment on the joint and survivor and early retirement factors is denied.

## VI. *ATTORNEY'S FEES*

■ The EPI Amendment provides for West Point's payment of an executive's attorney's fees on a current basis "[i]f at any time upon or after a Change of Control there should arise any dispute as to the validity, interpretation or application of any term or condition of this Agreement ... regardless of whether the Executive is the prevailing party." Hausen Aff.Ex. E ¶ 16 (EPI Amendment). Plaintiffs seek summary judgment on their entitlement to attorney's fees in connection with this suit. By its terms, the EPI Amendment only provides for the payment of attorney's fees in connection with disputes that arise "upon of after a Change of Control." Plaintiffs contend that their dispute arose on April 5, 1989, by which time the parties agree a change of control had occurred, and at which time Defendants paid them their lump sum payments on the basis of the PBGC-based interest rate. Defendants challenge Plaintiffs' entitlement to attorney's fees, arguing that the EPI Amendment's attorney's fee provision "served to deter acquirors from reneging on prior management's promises," and does not apply to disputes arising out of prior management's administration of change in control benefits. Defs.' Mem. in Opp. at 18.

The dispositive question is when the Plaintiffs' dispute "arose" for purposes of the EPI Amendment. Despite Plaintiffs' contentions that their dispute arose at the time of their lump sum payments, other dates—such as, *inter alia*, the time of the February 16, 1989 Committee Action or of Roark's February 22, 1989 letter—are also plausible trigger dates under the attorney's fee provision. The parties' submissions do not establish as a matter of law any particular triggering event or date. Thus, the applicability of the attorney's fee provision cannot yet be decided, and summary judgment on Plaintiffs' entitlement to attorney's fees is denied. *Compare* Brodie Aff.Ex. 3 at 4 (*Krumme v. West Point–Pepperell, Inc.,* 735 F.Supp. 575 (S.D.N.Y.1990) (Mem.End.) (finding issue of fact with respect to plaintiff's entitlement to attorney's fees in the *Krumme* action).

### VII. *INTEREST*

According to the terms of the EPI Amendment, Plaintiffs' lump sum payments were due no later than May 30, 1989. The EPI Amendment provides for interest on overdue payments at 2% over the Manufacturers Hanover reference rate. Manufacturers Hanover merged with Chemical Bank in July 1991, at which time the Manufacturers Hanover reference rate became the Chemical Bank prime rate. Plaintiffs move for summary judgment on their contractual entitlement to interest on any award they receive in this action. Defendants do not oppose this portion of the Plaintiffs' motion. The EPI Amendment is unambiguous on this point and the Court may therefore resolve the issue as a matter of law. *See e.g. John Hancock Mut. Life Ins. Co.,* 22 F.3d at 461. If Plaintiffs obtain a judgment recognizing their right to lump sum payments in excess of those they received, then they will be entitled to interest on the amount of their underpayment at a rate of 2% over the Chemical Bank prime rate.

### CONCLUSION

For the reasons stated, the Court grants Plaintiffs' motion for reargument; denies Defendants' cross-motion for partial summary judgment; and grants in part and denies in part Plaintiffs' cross-motion for partial summary judgment.

In summary, the Court holds that:

(1) the "promptness requirement" does not apply to this suit;

(2) the Cluett Committee's attempt to amend the terms of the Cluett Pension Plan was ineffective under ERISA;

(3) for purposes of the EPI Amendment, the Cluett Pension Plan "contained" a discount rate of 5% at all times relevant to this lawsuit;

(4) Defendants have failed to provide evidence demonstrating that the parties' alleged mutual mistake was easily discoverable;

(5) Plaintiffs' claim for rescission based on mutual mistake presents genuine issues of material fact as to the Plaintiffs' beliefs at the times they signed the Releases and accepted their lump sum payments;

(6) Plaintiffs joint and survivor and early retirement factor claims, which were not previously raised, are not appropriate for summary judgment disposition;

(7) Plaintiffs have failed to establish as a matter of law that they are contractually entitled to attorney's fees under the EPI Amendment;

(8) Plaintiffs are entitled to interest of 2% over the Chemical Bank prime rate on any award they obtain for underpayment of their deferred compensation benefits under the EPI Amendment.

Although the Court holds that the discount rate applicable to the EPI Amendment is 5%, Plaintiffs' Releases may preclude judgment in their favor on the breach of contract claims. Accordingly, the issue remaining for the trier of fact on both Plaintiffs' breach of contract and rescission claims is whether the Releases were the product of mutual mistake and, thus, subject to rescission. Plaintiffs' claim of entitlement to attorney's fees under the EPI Amendment requires the trier of fact to determine when Plaintiffs' dispute under that contract arose. Also remaining for trial are all claims in Plaintiffs' complaint

**1226**

not addressed by the present motions for partial summary judgment.

SO ORDERED.