143 F.3d 71
 22 Employee Benefits Cas. 1208,
Pens. Plan Guide (CCH) P 23942Y
Robert D. KRUMME, Plaintiff-Appellee,
Gordon E. Allen; John Currier; Nicholas Pallotta; James
J. Dunne; Leo Fornero; Gerard P. Mandry; Norman
K. Matheson; Cochran P. Supplee and
Bruce E. Moore, Plaintiffs-Appellees,
Cross-Appellants,
v.
WESTPOINT STEVENS INC., formerly known as West
Point-Pepperell, Inc., Defendant-Appellant-Cross-Appellee,
C. Powers Dorsett and D. Michael Roark, Defendants-Cross-Appellees.
 Docket Nos. 97-7312, 97-7384.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 20, 1997.
Decided May 1, 1998.
 
 Francis Carling, New York City (Collazo Carling & Mish, New York City, Frederick A. Brodie, Daniel Z. Mollin, Lewis A. Polishook, Winthrop Stimson Putnam & Roberts, New York City, of counsel),for Defendant-Appellant-CrossAppellee WestPoint Stevens Inc. and Defendants-Cross-Appellees C. Powers Dorsett, D. Michael Roark and Appellant West PointPepperell, Inc. (now known as WestPoint Stevens Inc.).
 Robert J. Hausen, New York City (Christine P. Searl, Chadbourne & Parke, New York City, of counsel), for Plaintiffs-Appellees-Cross-Appellants Gordon E. Allen, John Currier, Nicholas Pallotta, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Cochran P. Supplee and Bruce E. Moore.
 James W. Harbison, Jr., New York City (Carolyn W. Jaffe, Morgan, Lewis & Bockius, New York City, of counsel), for Plaintiff-Appellee Robert D. Krumme.
 Before: WINTER, Chief Judge, MESKILL, Circuit Judge, and MARTIN, District Judge.*
 MESKILL, Circuit Judge:
 
 
 1
 This is a consolidated appeal from judgments rendered in the United States District Court for the Southern District of New York, Scheindlin, J., in connection with two lawsuits, Allen v. West Point-Pepperell, Inc., 90 Civ. 3841 (S.D.N.Y.), and Krumme v. West Point-Pepperell, 89 Civ. 2016 (S.D.N.Y.). At the heart of this appeal is a dispute among the parties over a pension plan committee's authority to adopt actuarial assumptions in connection with calculating an accelerated lump sum payment of future accrued retirement benefits. Due to their factual complexity and the numerous legal issues arising in these bitterly contested lawsuits, our discussion of the factual background is extensive.
 
 BACKGROUND
 
 2
 Consolidated on appeal are judgments from two lawsuits, Allen and Krumme. In Allen, the plaintiffs are nine former senior executives of Cluett, Peabody & Company (Cluett).[1] In Krumme, the plaintiff is Robert D. Krumme, Cluett's General Counsel until 1986 when he departed on West Point-Pepperell, Inc.'s (now know as WestPoint Stevens, Inc. and hereinafter referred to as "WestPoint") acquisition of Cluett. WestPoint is a Georgia textile and apparel manufacturer which acquired Cluett in 1986 and operated it as a wholly owned subsidiary until Cluett's merger into WestPoint on January 1, 1989. WestPoint eventually sold Cluett to Bidermann Industries U.S.A., Inc. in March 1990.
 
 
 3
 The sole defendant in Krumme is WestPoint. The Allen plaintiffs brought suit against WestPoint and D. Michael Roark, C. Powers Dorsett and Barry F. Shea, three WestPoint executives. Roark was Vice President of Human Resources for Cluett until 1986, and then Vice President of Human Resources for WestPoint until May 1989. At all relevant times, Dorsett was WestPoint's General Counsel. Barry F. Shea, WestPoint's Treasurer, originally was named as a defendant and then was dropped from the complaint by stipulation on January 28, 1997.
 
 1. The EPI Amendment
 
 4
 In 1975, Cluett established an employee benefit program for its senior executives, the Executive Permanent Insurance Program (EPI Program). Among other things, the EPI Program provided deferred compensation benefits to its participants. Upon reaching age 65, EPI Program participants would receive lifetime monthly payments equal to, on an annual basis, 30% of the participants' final base salary. Krumme and each of the Allen plaintiffs agreed to participate in the EPI Program.
 
 
 5
 On October 24, 1988, a wholly owned subsidiary of Farley, Inc. (Farley) initiated a tender offer for all outstanding shares of WestPoint common stock. By November 21, 1988, Farley controlled 35.17% of that stock. Threatened with a hostile takeover, WestPoint sought to protect the retirement benefits of EPI Program participants. See Allen v. WestPoint-Pepperell, 933 F.Supp. 261, 264 (S.D.N.Y.1996) (finding that WestPoint sought to "protect participants in the event the company experienced a change in control") (hereinafter "Allen I "). Specifically, on November 11, 1988, WestPoint offered EPI Program participants an amendment to the EPI Program (EPI Amendment) under which the participants in the event of a "Change in Control,"[2] could choose a lump sum payment in an amount that would be the "Actuarial Equivalent" of their future stream of retirement benefits. The "Actuarial Equivalent" represented an amount having the "same present value" as the stream of retirement benefits under the EPI Program. As an additional measure of protection for EPI Program participants, the EPI Amendment included a fee-shifting provision to reimburse EPI Program participants for their costs and attorney's fees incurred in connection with enforcing their rights under the EPI Program after a change in control, regardless of whether the participant is a prevailing party.[3]
 
 2. Calculating the Actuarial Equivalent
 
 6
 EPI Amendment § 4A. (1)(c) established the basis for computing the "Actuarial Equivalent" of accrued retirement benefits. It states, in pertinent part:
 
 
 7
 For the purpose of establishing whether a benefit is the Actuarial Equivalent of another benefit the actuarial assumptions contained in Cluett's Employee Retirement Plan ["Cluett Plan"] shall be employed for so long as that Plan remains in existence and if such Plan is no longer in existence, the actuarial assumptions last used by such Plan shall be used.
 
 
 8
 EPI Amendment § 4A. (1)(c) (emphasis added). Section 1.3 of the Cluett Plan sets forth the actuarial assumptions incorporated by section 4A. (1)(c). In November 1988, at the time the EPI Amendment was offered to EPI Program participants, section 1.3 provided:
 
 
 9
 "Actuarial Equivalent" means an amount of equal value when computed on the basis of interest, mortality and other tables as shall be adopted from time to time by the [Cluett Pension Plan] Committee on the advice of the Actuary, the current factors being as specified below:
 
 
 10
 1. Mortality Table The 1978 GAM Table (which is the 1971 Group Annuity Mortality Table projected to 1978 with Scale E). An average of male and female rates will be used.
 
 
 11
 2. Interest rate 5% per annum, compounded annually.
 
 
 12
 3. Other factors None.
 
 
 13
 Cluett Plan § 1.3 (first emphasis added).[4] The "Interest Rate" (hereinafter the "discount rate") is the rate at which the future stream of retirement benefits under the EPI Program is discounted to present value before distribution to participants in a lump sum form. The relationship between the discount rate and the amount of the lump sum is inverse; the higher the discount rate, the less the EPI Program participant receives. See Allen v. WestPoint-Pepperell, 954 F.Supp. 682, 690 n. 9 (S.D.N.Y.1997) (explaining the relationship between the discount rate and size of lump sum payment). Notably, although the Cluett Pension Plan Committee (Cluett Committee) had the authority under section 1.3 to adopt new actuarial assumptions "from time to time," Cluett's Board of Directors (Cluett Board), under sections 11.1 and 9.1, reserved exclusive authority to amend the Cluett Plan.[5]
 
 
 14
 Within a few weeks after the EPI Amendment was offered, all of the plaintiffs in Krumme and Allen agreed to the terms of the EPI Amendment and opted to receive a single lump sum payment upon a change in control. Krumme, in returning his executed EPI Amendment to WestPoint, appended a cover letter dated December 9, 1988. It stated, in pertinent part: "Finally, I understand that the discount rate applicable under the Cluett Employee Retirement Plan is 5% and that would be the basis on which our benefits would be calculated under this change of control payout " (emphasis added). We now discuss the specific factual events underlying the disputes in Allen and Krumme.
 
 
 15
 3. The Error Discovered in the EPI Amendment
 
 
 16
 In early February 1989, WestPoint discovered a drafting error in the EPI Amendment. Section 4A. (1)(c) mistakenly had incorporated the actuarial assumptions contained in the Cluett Plan, and in particular a 5% discount rate that was well below market rate. See Allen I, 933 F.Supp. at 266 (finding that EPI Amendment's incorporation of the Cluett Plan's 5% discount rate was an error and was " 'totally inappropriate' given the high interest rates that prevailed at the time"). WestPoint, with respect to the EPI Amendment, had intended to incorporate the floating Pension Benefit Guaranty Corporation (PBGC)-based discount rate contained in WestPoint 's Pension Plan. To correct this drafting error, WestPoint management determined that the Cluett Committee had the authority to change the discount rate in the Cluett Plan on advice of the Cluett Plan's actuary. See Cluett Plan § 1.3 (providing that the Cluett Committee was authorized to adopt new discount rates "from time to time ... on the advice of the Actuary"); Cluett Plan § 9.6 (reaffirming the Cluett Committee's authority to alter the actuarial assumptions from time to time and providing that the "decisions and the records of the Committee shall be conclusive and binding upon the Company, Participants, and all other persons having any interest under the Plan").[6] In accordance with sections 1.3 and 9.6, WestPoint solicited from the Cluett Plan's actuary, TPF & C, a recommendation as to the discount rate to be used in the Cluett Plan.
 
 
 17
 On February 16, 1989, TPF & C recommended that the Cluett Plan's discount rate be changed from a fixed 5% rate to a floating rate calculated at 120% of the PBGC immediate interest rate, yielding, at all relevant times, a 9.3% discount rate (hereinafter "9.3% discount rate"). Accordingly, the Cluett Committee, on that same day, adopted TPF & C's recommendation and formally recorded this action in its minutes. At no relevant time, however, did the Cluett Board, which ceased to exist in January 1989, or the WestPoint Board of Directors ever vote to amend the actuarial assumptions in the Cluett Plan to reflect this change in the discount rate to 9.3%.
 
 4. The February 22, 1989 Releases
 
 18
 WestPoint, upon adopting the 9.3% discount rate for the Cluett Plan, became concerned that some of the EPI Program participants had executed the EPI Amendment with the expectation that their lump sum benefits would be calculated at a 5% rate. See Allen I, 933 F.Supp. at 267. WestPoint therefore offered to rescind the EPI Amendment for those EPI Program participants who objected to the increase in the discount rate. Specifically, on February 22, 1989, defendant Roark sent a letter to each of the participants who had executed the EPI Amendment (hereinafter "February 22, 1989 Letter"). The February 22, 1989 Letter stated, in pertinent part:
 
 
 19
 There has apparently been some confusion as to the method of calculation to be employed in determining the lump sum benefit under the [amended EPI Program]. Some participants have told us that they were led to believe that a 5% discount rate would be used to determine lump sum values. This is incorrect.
 
 
 20
 The letter continued that "[t]he formula under the Cluett Employee Retirement Plan which is referenced in the [EPI Amendment] calls for converting monthly annuities to lump sum amounts" with the 9.3% discount rate that had "been adopted for all plans of WestPoint Pepperell and its subsidiaries which provide for lump sum payouts upon a change in control." The February 22, 1989 Letter requested that the EPI Program participants execute an appended election form in which they could either choose to execute a release of WestPoint and remain eligible to receive a lump sum payout at a 9.3% discount rate or rescind their agreement to the EPI Amendment. The letter also provided that, in the event of a change in control, no lump sum payment of the accrued deferred compensation would be made until the election form was returned. All of the Allen plaintiffs executed the release.[7] Krumme, however, refused and instead, in a series of letters in February and March 1989, protested the change in the discount rate to defendants Dorsett and Roark.
 
 
 21
 On February 23, 1989, WestPoint announced that it had entered into a definitive merger agreement with Farley. On April 5, 1989, Farley purchased approximately 95% of WestPoint's stock in connection with its tender offer. Deeming that a change in control had occurred on April 5, WestPoint on that same day sent to each of the Allen plaintiffs a check for an amount representing the lump sum payment of their accrued retirement benefits, calculated at a 9.3% rate. The letter accompanying the lump sum payout check stated that "[b]y cashing this check you acknowledge that [WestPoint's] obligation to make informal [EPI] payments has been fully satisfied" (hereinafter "April 5, 1989 Letter"). The Allen plaintiffs cashed their checks without protest. Krumme, who had not executed the release, did not receive a lump sum check.
 
 5. Pleadings and Pre-Trial Motions
 
 22
 On March 24, 1989, Krumme filed a complaint against WestPoint. He alleged that a change in control occurred on February 23, 1989 when WestPoint entered into a definitive merger agreement with Farley. Furthermore, he claimed that (1) WestPoint breached its contractual obligation under the EPI Amendment to distribute his lump sum payment calculated at a 5% rate and to reimburse him for his legal expenses incurred in connection with his dispute with WestPoint, and (2) because Krumme executed the EPI Amendment in reliance on WestPoint's representations that 5% would be the rate at which the lump sum would be calculated, WestPoint should be estopped from asserting that the discount rate was 9.3%.[8] WestPoint, in its answer filed on May 8, 1989, alleged, among other affirmative defenses, that Krumme never entered into a contract with WestPoint in connection with the EPI Amendment.
 
 
 23
 In Krumme, WestPoint moved on October 2, 1989 for partial summary judgment, arguing, among other things, that no contract had been formed between Krumme and WestPoint in connection with the EPI Amendment. Specifically, WestPoint argued that Krumme's December 9, 1988 cover letter accompanying his executed EPI Amendment contained additional terms at variance with WestPoint's offer, thereby converting Krumme's acceptance into a rejection and counteroffer. In that December 9 letter, Krumme stated, "Finally, I understand that the discount rate applicable under the Cluett Employee Retirement Plan is 5% and that would be the basis on which our benefits would be calculated under this change of control payout" (emphasis added). WestPoint asserted that by virtue of Krumme's use of the term "would be," Krumme conditioned his acceptance of the EPI Amendment on the inclusion of the additional term that the 5% discount rate would be the exclusive rate at which his lump sum payment would be calculated, notwithstanding that the Cluett Plan and EPI Amendment clearly contemplated that the discount rate was subject to change.
 
 
 24
 Krumme filed a cross-motion for partial summary judgment on November 15, 1989. On April 19, 1990, the district court, Conboy, J., in an unpublished order, granted partial summary judgment in favor of Krumme on the limited issue that Krumme and WestPoint had entered into a binding contract with respect to the EPI Amendment. The district court concluded that "the [December 9] letter set out the parties' understanding of how the provisions of the [EPI] Amendment would have been implemented had the 'Change in Control' occurred at the moment of the execution of the Amendment."
 
 
 25
 The Allen plaintiffs filed their action on June 6, 1990. Unbeknownst to defendants at the time, each of the Allen plaintiffs, by May 1990, had signed agreements with Krumme retaining him as their counsel. See Allen I, 933 F.Supp. at 267 (finding that "Krumme contacted several of the Allen Plaintiffs to encourage them to bring suit against WestPoint, and to discuss the possibility of their retaining him as counsel").[9] The Allen plaintiffs alleged that a change in control occurred on or before November 21, 1988 (when Farley controlled approximately 35.17% of WestPoint's common stock) and in no event later than February 23, 1989 (when WestPoint entered into a definitive merger agreement with Farley). Furthermore, the Allen plaintiffs alleged that WestPoint management had increased the discount rate not to correct a mistake in the EPI Amendment but to cut costs and attract a bid from a "white knight" buyout group in which WestPoint's management hoped to participate. The Allen plaintiffs alleged that defendants sought to obtain the February 22, 1989 releases in order to induce the EPI Amendment participants unwittingly to release WestPoint from its enforceable obligation to pay their lump sum payouts calculated at a 5% rate. The Allen plaintiffs also claimed that defendants' material misrepresentations and omissions in the February 22 and April 5, 1989 Letters induced them to sign the release forms, causing them to suffer damages in the amount of the difference in their lump sum payments calculated at a 9.3% rate as opposed to a 5% rate.
 
 
 26
 In connection with these allegations, the Allen plaintiffs brought several claims against defendants WestPoint, Roark and Dorsett, alleging that (1) WestPoint breached its contractual obligation to pay their lump sum benefits calculated at a 5% rate and to reimburse them for their costs and attorney's fees; (2) defendants breached their fiduciary duty to act with due care and without self-dealing when they secretly increased the discount rate to increase WestPoint's value in contemplation of a buyout bid; (3) defendants committed fraud in connection with the February 22 and April 5, 1989 Letters by misrepresenting and omitting material information concerning the terms of the EPI Amendment;[10] and (4) WestPoint violated New York labor law as the difference between the lump sum payments calculated at a 9.3% and 5% rate represented unpaid "wages," see N.Y. Lab. Law §§ 190-99 (McKinney 1986). The Allen plaintiffs also sought a declaratory judgment against WestPoint to rescind the releases they had executed pursuant to the February 22, 1989 Letter. They argued that rescission was appropriate in view of the parties' mutual mistake or the Allen plaintiffs' unilateral mistake that 9.3% represented the governing discount rate and that a change in control had not occurred until April 5, 1989.
 
 
 27
 On August 3, 1990, the defendants in Allen moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6), arguing that as a matter of law, the Allen plaintiffs had released defendants from liability for all of their claims. On January 25, 1991, the district court, Conboy, J., dismissed the complaint in its entirety. On September 11, 1991, we reversed and remanded for further proceedings. See Allen v. WestPoint-Pepperell, 945 F.2d 40 (2d Cir.1991), rev'g 1991 WL 8505 (S.D.N.Y. Jan.25, 1991). On September 27, 1991, defendants in Allen filed their answer to the complaint and raised several affirmative defenses, including that the Allen plaintiffs' claims were barred by their releases and that defendants Roark and Dorsett, who were acting within the scope and course of their employment as agents of WestPoint, could not be held personally liable for fraud and breach of fiduciary duty.
 
 
 28
 In August 1995, on cross-motions for partial summary judgment in Allen, the district court, Scheindlin, J., to whom the cases had been reassigned, concluded that the Cluett Committee, under well settled principles of contractual interpretation, had the authority to adopt a new discount rate for the Cluett Plan. The Allen plaintiffs moved for reargument, asserting that ERISA law governed the district court's interpretation of the Cluett Plan. On November 6, 1995, the district court granted the motion for reargument, withdrew its August 1995 order, and issued a new order concluding that, under ERISA, the Cluett Committee had no authority to change the discount rate and that the 5% discount rate "was at all relevant times one of the actuarial assumptions 'contained in' the Cluett Pension Plan for purposes of the EPI Amendment." Allen v. West Point-Pepperell, 908 F.Supp. 1209, 1222-23 (S.D.N.Y.1995) (hereinafter "Allen II "), withdrawing and superseding, 1995 WL 463128 (S.D.N.Y. Aug.4, 1995). The district court reasoned that because the Cluett Committee, in adopting a new discount rate, had modified a specified plan term (the 5% rate), the Committee's action was valid under ERISA only insofar as it complied with Cluett Plan amendment procedures. See Allen II, 908 F.Supp. at 1221 (citing 29 U.S.C. § 1102(b)(3) (requiring plan to "provide a procedure for amending the plan, and for identifying the persons who have authority to amend the plan")); Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58-59 (4th Cir.1992) ("[A]ny modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing."), cert. denied, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993); Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir.1990) (plan may be changed only in conformity with formal amendment procedures). The authority to amend the Cluett Plan resided exclusively in the Cluett Board. The Cluett Board, however, had never formally amended section 1.3 of the Cluett Plan to reflect the new 9.3% rate. Consequently, the district court concluded that 5% remained as the governing discount rate at all relevant times.
 
 6. Bench Trial on Four Issues
 
 29
 The parties in both Allen and Krumme tried four issues to the district court: (1) the date of the change in control; (2) whether the Allen plaintiffs were entitled to have their releases rescinded on the basis of mutual mistake; (3) whether WestPoint, under the EPI Amendment, was obligated to reimburse Krumme and the Allen plaintiffs for their costs and attorney's fees incurred in connection with investigating and litigating their disputes with WestPoint; and (4) whether the February 22 and April 5, 1989 Letters misrepresented material information and failed to disclose material information concerning the terms of the EPI Amendment.
 
 
 30
 On January 3, 1996 the district court issued a joint opinion in both Allen and Krumme, concluding that the change in control of WestPoint to Farley had occurred on April 5, 1989. See Allen v. WestPoint-Pepperell, 1996 WL 2004, at * 6 (S.D.N.Y. Jan. 3, 1996). This decision is not appealed.
 
 
 31
 On the issue of rescission, on May 15, 1996, the district court declined to rescind the Allen plaintiffs' releases on the basis of mutual mistake. See Allen I, 933 F.Supp. at 269. The district court concluded that a rescission of the releases would provide the Allen plaintiffs with an "undeserved and unintended windfall" as WestPoint, under the outdated 5% discount rate, would be "forced to pay the Allen Plaintiffs nearly twice the market-based present value of their EPI benefits." Id.
 
 
 32
 In that same May 13, 1996 opinion, the district court concluded that the Allen plaintiffs and Krumme were entitled to recover their costs and attorney's fees under the EPI Amendment. See Allen I, 933 F.Supp. at 270; EPI Amendment § 16 (providing that EPI Program participants would be reimbursed for their costs and attorney's fees expended in connection with disputes "arising" upon or after a change in control). The district court reasoned that the plaintiffs were not entitled to a lump sum payment until a change in control had occurred. See EPI Amendment § 4A.1(2) (providing that upon a change in control, EPI Amendment participants are entitled to a lump sum payout). Prior to a change in control, therefore, the plaintiffs had no "legally cognizable dispute" over the terms of their lump sum payments. Allen I, 933 F.Supp. at 270. Accordingly, although Krumme had filed his present lawsuit on March 24, 1989, before the April 5th change in control, the district court concluded that neither Krumme's nor the Allen plaintiffs' "dispute" with WestPoint arose until April 5.
 
 
 33
 In Krumme, the district court, on October 22, 1996, deferred the computation of the costs and attorney's fees payable to Krumme until after appeal. Similarly, on February 27, 1997, the district court deferred the computation of the attorney's fees and costs payable to the Allen plaintiffs until after an appeal. On May 2, 1997, the district court certified to us, pursuant to 28 U.S.C. § 1292(b), the question whether parties may appeal a nonfinal decision to award attorney's fees and costs before their amounts have been assessed.[11] On May 5, 1997, WestPoint, without opposition, moved this Court to accept the certified question for decision. We denied WestPoint's motion to certify on June 10, 1997.
 
 
 34
 Finally, on the question of misrepresentation, the district court on January 28, 1997 rejected the Allen plaintiffs' three common law claims for constructive fraud, negligent misrepresentation, and fraudulent omission. See Allen v. WestPoint-Pepperell, 954 F.Supp. 682, 688-94 (S.D.N.Y.1997) (hereinafter "Allen III ").[12] The district court concluded that the Allen plaintiffs had not established, for any of the three multi-pronged common law causes of action, the requisite elements necessary to support a judgment in their favor. In particular, the Allen plaintiffs had not established that they relied on defendants' misrepresentations to their detriment, an element required for all three common law claims. See id. at 696 n. 15. The district court gave collateral estoppel effect to its May 13, 1996 decision that the EPI Amendment was intended "to provide participants with the actual present value of their benefits under the EPI Program," that rescission of the releases would provide the Allen plaintiffs with a "windfall" and that a 5% rate would force WestPoint to pay the Allen plaintiffs "nearly twice the market-based present value of their EPI benefits." Allen I, 933 F.Supp. at 268-69; Allen III, 954 F.Supp. at 696 ("[P]laintiffs were not harmed by use of the 9.3% discount rate because the rate satisfied the original intent of the parties--to provide EPI participants with the actual present value of their benefits upon a change of control.").
 
 
 35
 In Krumme, on February 20, 1996, WestPoint moved for leave to amend its answer to add an affirmative defense of estoppel on the grounds that Krumme, as Cluett's General Counsel, had supervised Cluett's 1983 amendment to section 1.3 of the Cluett Plan and had represented to WestPoint in 1985 that the Cluett Plan was in compliance with ERISA. WestPoint argued therefore that Krumme should be estopped from arguing that the Cluett Committee's authority to adopt new actuarial assumptions under section 1.3 violated ERISA. WestPoint also sought to add counterclaims (1) to rescind the EPI Amendment as the incorporation of the Cluett Plan's 5% discount rate was a mistake; (2) to reform the EPI Amendment to incorporate the actuarial assumptions contained in WestPoint 's Employee Retirement Plan instead of Cluett's Plan; (3) for legal malpractice against Krumme because (a) Krumme had negligently supervised the Cluett Board's amendment to section 1.3 in 1983, resulting in a provision that violated ERISA, and (b) Krumme breached his duty to his former client, Cluett (and to WestPoint as Cluett's successor), by soliciting the Allen plaintiffs to sue WestPoint on matters substantially related to the subject matter of Krumme's former representation of Cluett; and (5) for breach of contract because Krumme was bound by an implied duty to exercise due care in the performance of his duties on behalf of Cluett and to refuse employment adverse to his former client on matters substantially related to Krumme's work for Cluett.
 
 
 36
 On May 15, 1996, the district court denied WestPoint's motion to amend. The district court concluded that "the proposed amendments are based on facts known to Defendant since 1989." See Krumme v. West Point-Pepperell, 1996 WL 257633, at * 1 (S.D.N.Y. May 15, 1996). Furthermore, "[d]efendant ha[d] offered no adequate excuse for its delay in seeking to amend its answer. Moreover, it is readily apparent that the proposed amendments would require a new wave of discovery and would substantially delay the resolution of this action." Id. In this same opinion, the district court granted Krumme's motion for partial summary judgment on his breach of contract claim. Id. The court gave collateral estoppel effect to its November 1995 conclusion in Allen II that the Cluett Committee, under ERISA, had no authority to change the discount rate and that the Cluett Plan's discount rate remained 5% at all relevant times. Id.
 
 
 37
 On February 11, 1997, judgment was entered for Krumme in the amount of $535,206.76, the total of Krumme's lump sum payment calculated at a 5% rate plus contractual prejudgment interest. Krumme also was awarded costs and attorney's fees from WestPoint in an amount that was to be determined after appeal. In Allen, judgment on the merits on all claims in the complaint was rendered in favor of the defendants on February 27, 1997.[13] Like Krumme, the Allen plaintiffs were entitled to recover their costs and attorney's fees from WestPoint with the amount of those costs and fees to be determined after appeal.
 
 
 38
 WestPoint filed timely notices of appeal in Krumme and Allen on March 12, 1997 and March 24, 1997, respectively. The Allen plaintiffs filed notice of cross-appeal on March 27, 1997. By Order dated April 17, 1997, we consolidated the Allen and Krumme appeals.
 
 7. Arguments Raised on Appeal
 
 39
 With respect to the judgment in Allen, WestPoint appeals from the district court's conclusion that 5% represented the governing rate at which to calculate the Allen plaintiffs' lump sums. See Allen II, 908 F.Supp. at 1223. Although this conclusion did not affect the outcome in Allen, as judgment was ultimately rendered for WestPoint, it did provide the basis, by way of collateral estoppel, for the district court's grant of summary judgment in favor of Krumme on his breach of contract claim. WestPoint argues that (1) the Cluett Committee's adoption of the 9.3% discount rate did not constitute a plan amendment and, therefore, Cluett Board action was not required under ERISA; (2) because the Allen plaintiffs pleaded no claim under ERISA in the complaint, they are barred from pursuing a claim or remedy under ERISA; (3) ERISA law is irrelevant to determine the Cluett Committee's authority to adopt actuarial factors because benefits due under the "top hat" EPI Program are at issue, not the Cluett Plan; (4) because the Cluett Committee has "the exclusive right to interpret the [Cluett] Plan and to decide any matters arising thereunder in connection with the administration of the Plan," its decisions under the Cluett Plan are entitled to deference, see Cluett Plan § 9.6, and (5) the Allen plaintiffs were not entitled to be reimbursed by WestPoint for their costs and attorney's fees.[14]
 
 
 40
 In opposition to WestPoint, the Allen plaintiffs and Krumme raise several arguments: (1) Revenue Ruling 79-90 requires that new actuarial assumptions be adopted exclusively pursuant to a plan's formal amendment procedures; (2) those responsible for administering the Cluett Plan since the Cluett Committee's purported adoption of the 9.3% rate have adhered to the 5% rate, demonstrating that the discount rate was never changed;[15] (3) WestPoint, in its pleadings, stipulations, and statements of counsel, has admitted that (a) the Cluett Committee minutes were not part of the Cluett Plan; (b) the actuarial assumptions could be changed only by Cluett Board amendment; and (c) the relevant actuarial assumptions are those printed in section 1.3 of the Cluett Plan document; and (4) even if the Cluett Commmittee validly adopted the 9.3% rate, WestPoint, under 29 U.S.C. § 1054(g), was required to use a blended discount rate in calculating the lump sum payouts, i.e., a 5% discount rate for benefits accrued through February 15, 1989 and the 9.3% rate for benefits accrued after February 15, 1989. See 29 U.S.C. § 1054(g)(1) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." (emphasis added)).
 
 
 41
 With respect to the judgment in Krumme, WestPoint argues that (1) the parties in Krumme never entered into a binding contract in connection with the EPI Amendment; (2) the district court abused its discretion by denying WestPoint's motion for leave to amend its answer; and (3) Krumme was not entitled to be reimbursed by WestPoint for his attorney's fees and costs.[16]
 
 
 42
 On appeal, the Allen plaintiffs argue that the district court erred in concluding (1) that they failed to establish the requisite element of their common law fraud claims and, in particular, that they had not been harmed by the adoption of the 9.3% rate; and (2) that they were not entitled to have their releases rescinded on the basis of mutual mistake. In connection with the fraud and rescission claims, the Allen plaintiffs challenge the district court's factual findings that (a) the incorporation of the Cluett Plan's 5% discount rate in the EPI Amendment was a mistake; (b) that the Cluett Committee adopted the 9.3% discount rate to correct this "mistake;" and (c) that the enforcement of the 5% discount rate would result in an undeserved windfall for the Allen plaintiffs.
 
 
 43
 As discussed below, we conclude that the Cluett Committee effectively adopted a 9.3% discount rate on February 16, 1989, that the EPI Amendment incorporated this 9.3% rate, and that the Allen plaintiffs' lump sum payments were calculated properly at a 9.3% rate. Because the Allen plaintiffs' rescission and fraud claims both were predicated on the theory that 5% represented the proper discount rate at which to calculate their lump sum payouts under the EPI Amendment, we affirm the district court's judgment on the merits without reaching these claims. In Krumme, we vacate the judgment and remand for further proceedings in light of our decision. We conclude that we have no appellate jurisdiction to review the district court's award of attorney's fees and costs to Krumme and to the Allen plaintiffs until the district court has set the actual amount of those fees and costs. We therefore remand to the district court for the calculation of attorney's fees and costs.
 
 DISCUSSION
 
 44
 We have jurisdiction to review the merits of the judgments in Allen and Krumme before the district court has resolved the issue of attorney's fees and costs. See Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202, 108 S.Ct. 1717, 1721-22, 100 L.Ed.2d 178 (1988) (adopting "a uniform rule that an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final"); Farkas v. Rumore, 101 F.3d 20, 22 (2d Cir.1996) (per curiam) ("[W]here an order disposes of a party's substantive claims, but does not dispose of claims relating to attorney's fees, the time for appeal of the substantive claims starts to run from the date of the first order unless the district court explicitly grants a delay." (citations omitted)). As we explain below, however, we do not have jurisdiction to review the district court's award of attorney's fees to Krumme and to the Allen plaintiffs until the actual amount of fees and costs have been set.
 
 
 45
 1. Contract Formation Between Krumme and WestPoint
 
 
 46
 WestPoint appeals the district court's grant of summary judgment in favor of Krumme on the issue of contract formation. Specifically, WestPoint argues that Krumme conditioned his acceptance of the EPI Amendment on the inclusion of an additional term that the 5% discount rate would be the exclusive rate at which his lump sum payment would be calculated, notwithstanding that the EPI Amendment and the Cluett Plan clearly contemplated that the discount rate was subject to change.
 
 
 47
 We review de novo the district court's grant of summary judgment, see Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir.1993), and construe all "inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citation and internal quotation marks omitted). We do not resolve disputed issues of fact but determine whether genuine issues of fact exist to be resolved at trial. See Sayers, 7 F.3d at 1094. Summary judgment is proper when the "words and actions that allegedly formed a contract [are] so clear themselves that reasonable people could not differ over their meaning." Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir.1994) (citation and internal quotation marks omitted); Sayers, 7 F.3d at 1094; Brown Bros. Elec. Contractors v. Beam Construction Corp., 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 351-52, 361 N.E.2d 999, 1001 (1977) (citations omitted).
 
 
 48
 Under New York law, an acceptance "must comply with the terms of the offer and be clear, unambiguous and unequivocal." King v. King, 208 A.D.2d 1143, 1144, 617 N.Y.S.2d 593, 594 (N.Y.App.Div.1994) (citations omitted). "A proposal to accept the offer if modified or an acceptance subject to other terms and conditions [is] equivalent to an absolute rejection of the offer." See Poel v. Brunswick-Balke-Collender Co., 216 N.Y. 310, 319, 110 N.E. 619, 622 (1915). However, "[i]f the acceptance of an offer is initially unconditional, the fact that it is accompanied with a direction or a request looking to the carrying out of its provisions, but which does not limit or restrict the contract, does not render it ineffectual or give it the character of a counteroffer." Valashinas v. Koniuto, 283 A.D. 13, 17, 125 N.Y.S.2d 554, 558 (N.Y.App.Div.1953), aff'd, 308 N.Y. 233, 239, 124 N.E.2d 300, 302 (1954) (A "suggestion, request or overture" in an acceptance are not conditions); see Matter of McManus, 83 A.D.2d 553, 558, 440 N.Y.S.2d 954, 957 (N.Y.App.Div.1981) ("An exact and unconditional acceptance of an offer is not afterward turned into a conditional acceptance or counteroffer so as to prevent the formation of a contract, by an improper interpretation of the terms of the agreement by one of the parties." (citations omitted)), aff'd, 55 N.Y.2d 855, 447 N.Y.S.2d 708, 432 N.E.2d 601 (1982).
 
 
 49
 We conclude as a matter of law that Krumme unconditionally accepted WestPoint's offer. Krumme executed the EPI Amendment without modification. Furthermore, even assuming that Krumme's cover letter can be read as expressing an additional term that the 5% discount rate was not subject to change, nothing in Krumme's cover letter suggests that he conditioned his acceptance on this request or "understanding" of his agreement with WestPoint. We therefore affirm the district court's grant of summary judgment in favor of Krumme.
 
 2. Change to the Discount Rate
 
 50
 WestPoint argues that the district court erred in concluding that the Cluett Committee had no authority under ERISA to amend the discount rate and that the discount rate incorporated into the EPI Amendment remained 5% at all relevant times. See Allen II, 908 F.Supp. at 1222. WestPoint contends that the Cluett Committee, acting under section 1.3's express authority to adopt new actuarial assumptions "from time to time," did not amend the Cluett Plan and therefore a formal Cluett Board amendment was not required under ERISA. According to WestPoint, the Cluett Committee properly sought and implemented the recommendation of TPF & C, its actuary, and formally recorded the adoption of the 9.3% rate in the Cluett Committee's minutes. Because the Cluett Committee minutes constitute binding Cluett Plan documents, WestPoint contends that the EPI Amendment incorporated the 9.3% discount rate memorialized in the Cluett Committee minutes. We agree.[17]
 
 
 51
 Under ERISA, an employee benefit plan is required to be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), and to "specify the basis on which payments are made ... from the plan." Id. at (b)(4); see Rinard v. Eastern Co., 978 F.2d 265, 268 n. 2 (6th Cir.1992) (concluding that the pension plan need not be contained in a single written document), cert. denied, 507 U.S. 1029, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993); Board of Trustees v. Weinstein, 107 F.3d 139, 142-43 (2d Cir.1997) (defining "instrument" in section 1102(a)(1) as a "formal governing document" that "sets out rights, duties, obligations"). Furthermore, under 29 U.S.C. § 1102(b)(3), a plan must "provide a procedure for amending [the] plan, and for identifying the persons who have authority to amend the plan." See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 79, 115 S.Ct. 1223, 1228-29, 131 L.Ed.2d 94 (1995) (when a plan reserves amendment power in a specific corporate body, "one must look only to [that corporate body] and not to any other person" as the entity that may exercise amendment power); e.g., Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58-59 (4th Cir.1992) ("[A]ny modification to a plan must be implemented in conformity with the formal amendment procedures."), cert. denied, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993); Alday v. Container Corp. of America, 906 F.2d 660, 665 (11th Cir.1990) (same).
 
 
 52
 In considering whether, under ERISA, the Cluett Committee's authority to adopt new actuarial assumptions unlawfully conflicted with the Cluett Board's exclusive authority to amend the Cluett Plan, we are guided by a Seventh Circuit decision rendered on facts essentially indistinguishable from ours. See Dooley v. American Airlines, 797 F.2d 1447 (7th Cir.1986), cert. denied, 479 U.S. 1032, 107 S.Ct. 879, 93 L.Ed.2d 833 (1987). In Dooley, the plaintiffs were American Airlines' employees who elected to receive their retirement benefits in a lump sum amount that would be the actuarial equivalent of a future stream of periodic retirement payments. Their retirement plan defined "actuarial equivalent" as "the equivalent in value on the basis of actuarial factors approved from time to time by American Airlines." Id. at 1451. American Airlines, pursuant to offering the lump sum option to plaintiffs, also had issued a bulletin stating that the discount rate was 8-1/2%. Id. at 1449. At issue in Dooley, as here, was American Airlines' subsequent decision to switch from a fixed 8-1/2% discount rate to a floating rate that effectively increased the discount rate by several percentage points. The plaintiffs objected to this switch, arguing that the change to the floating rate constituted an "amendment" that resulted in the reduction of accrued benefits in violation of 29 U.S.C. § 1054(g) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." (emphasis added)).
 
 
 53
 The court, considering the merits of the plaintiffs' argument did not reach the issue of whether the actuarial assumptions were part of the pension plan, but held that, in any event, a change to the discount rate was not an "amendment;" American Airlines simply had acted pursuant to its authority to change actuarial assumptions from "time to time." Id. at 1451; see id. at 1452 ("[W]e are unwilling to contort the plain meaning of 'amendment' so that it includes the valid exercise of a provision which [is] already firmly ensconced in the pension document."); accord Oster v. Barco of California Employees' Retirement Plan, 869 F.2d 1215, 1219 (9th Cir.1988); Stewart v. National Shopmen Pension Fund, 730 F.2d 1552, 1561 (D.C.Cir.1984) (there is no "amendment" when a "provision already incorporated into the plan [is] applied [and][a]ctions authorized by the plan [a]re carried out by the persons authorized to do so"); Holian v. Leavitt Tube Co., 1989 WL 44570, at * 4 (N.D.Ill. Apr. 28, 1989) (where plan provision authorized plan committee to add "valuation dates," the addition of such dates was not an amendment within the exclusive purview of the plan's board of directors because plan committee applied provision already incorporated into the plan); Whitaker v. Texaco, 729 F.Supp. 845, 851 (N.D.Ga.1989) ("[I]f the provision itself gives the fiduciary discretion, then exercising that discretion is obviously not an amendment of a provision, it is simply the exercise of a provision.").
 
 
 54
 We disagree with the Allen plaintiff's argument that, in light of Revenue Ruling 79-90, Dooley is bad law. Rather, the court purposefully fashioned a "commonsensical rule of law" that applied regardless of this Ruling. Further, we follow Dooley 's "commonsensical rule of law" and conclude that the Cluett Committee, under Cluett Plan § 1.3, adopted a 9.3% discount rate under ERISA without amending the Cluett Plan's terms. Dooley, 797 F.2d at 1452. As in Dooley, the Cluett Committee acted under its express authority to adopt new actuarial assumptions "from time to time" on the recommendation of its actuary, TPF & C. See Cluett Plan § 1.3. Therefore, notwithstanding the absence of a Cluett Board amendment, the Cluett Committee validly adopted the 9.3% discount rate.[18] Moreover, in accordance with 29 U.S.C. § 1102(a)(1) and (b)(4), the Cluett Committee memorialized the adoption of the 9.3% discount rate in a written instrument, that is, the Cluett Committee minutes. Terms contained in the Committee's minutes are "conclusive and binding upon the Company, Participants, and all other persons having any interest under the Plan." See Cluett Plan § 9.6; Weinstein, 107 F.3d at 142-45 (concluding that documents that set forth terms that are binding on plan administrators are "instruments under which a plan is established or operated." (quoting 29 U.S.C. § 1024(b)(4))). Accordingly, the EPI Amendment, pursuant to § 4A.1(c), incorporated this 9.3% discount rate when it was memorialized in the Cluett Committee minutes. See EPI Amendment § 4A.1(c) (incorporating actuarial assumptions "contained in" the "Cluett Employee Retirement Plan").
 
 
 55
 We address and quickly dispose of Krumme's and the Allen plaintiffs' remaining arguments. First, Revenue Ruling 79-90 expresses no requirement that new actuarial assumptions be adopted exclusively pursuant to a plan's formal amendment procedures. See Rev. Rul. 79-90, 1979--1 C.B. 155 (codified at 26 U.S.C. § 401(a)(25)). Rather, the Revenue Ruling simply requires employers to specify their actuarial assumptions in the plan and eliminates their discretion to choose actuarial factors ad hoc.[19] Furthermore, because we conclude that the Cluett Committee did not amend the Cluett Plan, 29 U.S.C. § 1054(g) does not require the use of a blended discount rate. See 29 U.S.C. § 1054(g) (prohibiting the reduction of accrued benefits by "amendment"); Dooley, 797 F.2d at 1452. We also conclude that the plaintiffs' argument that WestPoint be bound to a series of judicial admissions made in the district court proceedings is baseless; plaintiffs seek an advantage by quoting WestPoint out of context.
 
 
 56
 Finally, to support their argument that the discount rate was never changed and remained 5% at all relevant times, the plaintiffs contend that (1) on April 24, 1989, Ms. Virginia Mansfield received a lump sum payout under the Cluett Plan calculated at a 5% rate; (2) Bidermann's actuary, The Wyatt Company, employed a 5% rate to calculate benefits due to former Cluett employees under the Cluett Plan; and (3) although Cluett Plan participants, under 29 U.S.C. § 1024(b)(1), were entitled to receive notice of a material modification to the Cluett Plan, they never were notified of the new 9.3% rate, see 29 U.S.C. § 1024(b)(1). Even accepting the truth of these allegations, however, they do not support the plaintiffs' argument. We already have concluded as a matter of law that the Cluett Committee, on February 16, 1989, validly adopted the 9.3% discount rate. Any subsequent payments using an erroneous rate would not change that conclusion.
 
 3. Attorney's Fees
 
 57
 WestPoint urges us to review the district court's award of attorney's fees and costs to the plaintiffs although the amount of those fees and costs have not yet been set. WestPoint argues that by doing so, we may conserve scarce judicial resources. The plaintiffs' attorneys in both Allen and Krumme have accumulated immense fees and costs over the lengthy course of these lawsuits and disputes are certain to arise as to the proper amount of fees and costs to which they are entitled. According to WestPoint, if we were to determine expeditiously that the district court's award of fees and costs to plaintiffs was error, we would prevent the needless expenditure of judicial resources. WestPoint contends that we have jurisdiction pursuant to 28 U.S.C. § 1291 or, alternatively, under the doctrine of pendent appellate jurisdiction.
 
 
 58
 Under section 1291, we review final decisions of the district court that "leave[ ] nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633-34, 89 L.Ed. 911 (1945). Where attorney's fees and costs have been awarded, but not determined, the order is not final. See Discon, Inc. v. NYNEX Corp., 4 F.3d 130, 133 (2d Cir.1993) ("[A] sanction order that leaves the amount of the sanction for later determination is not final and, therefore, not appealable under § 1291."); see Pridgen v. Andresen, 113 F.3d 391, 394 (2d Cir.1997) ("[R]ules of finality for sanction orders parallel the rules for attorney fee awards." (citation and internal quotation marks omitted)); F.H. Krear & Co. v. Nineteen Named Trustees, 776 F.2d 1563, 1564 (2d Cir.1985) (per curiam) ("We have held that where attorneys' fees are a contractually stipulated element of damages, a judgment is not final until the fees have been determined.").
 
 
 59
 Under the doctrine of pendent appellate jurisdiction, however, "once we have taken jurisdiction over one issue in a case, we may, in our discretion, consider otherwise nonappealable issues in the case as well, where there is sufficient overlap in the factors relevant to the appealable and nonappealable issues to warrant our exercising plenary authority over the appeal." San Filippo v. U.S. Trust Co. of New York, 737 F.2d 246, 255 (2d Cir.1984), cert. denied, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985); see Synergy Gas Co. v. Sasso, 853 F.2d 59, 62 (2d Cir.), cert. denied, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988); Pridgen, 113 F.3d at 394 (in Synergy, the adjudication "was at most an exercise of pendent appellate jurisdiction" (citation and internal quotation marks omitted)). We have, however, rejected the doctrine of pendent appellate jurisdiction as a basis to review an undetermined award of attorney's fees, even when the question of liability for the fees had been consolidated with other decisions that were final. See Cooper v. Salomon Bros., 1 F.3d 82, 85 (2d Cir.1993) (the policy of promoting " 'orderly judicial administration' " cannot "justify broadening the jurisdiction of a federal court without congressional approval"), cert. denied, 510 U.S. 1063, 114 S.Ct. 737, 126 L.Ed.2d 700 (1994); accord Pridgen, 113 F.3d at 394.
 
 
 60
 Although we are cognizant of the serious practical considerations supporting WestPoint's argument, we adhere to our prior holdings that we have no jurisdiction, under 28 U.S.C. § 1291, to review a grant of attorney's fees and costs until the amount of fees and costs have been set. See Pridgen, 113 F.3d at 394 (holding that orders awarding attorney's fees are not appealable until those fees have been set). We reject WestPoint's argument that under the rule established in Budinich v. Becton Dickinson & Co., 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), we have jurisdiction over the attorney's fees issue. In Budinich, the Court held that a decision on the merits is final under section 1291 even if the recoverability and amount of attorney's fees for litigation remains to be determined. Id. at 202-03, 108 S.Ct. at 1721-22. In other words, the merits of a decision could be separated from attorney's fees issues for the purpose of appeal. The Court did not decide whether the issues of recoverability and amount of attorney's fees can be similarly separated. Although in Synergy, we arguably exercised pendent appellate jurisdiction to review an undetermined award of attorney's fees, we have since questioned that decision as the availability of appellate jurisdiction had not been raised in that case. See id. In light of our more recent and unequivocal conclusion in Cooper, we decline to exercise pendent appellate jurisdiction.
 
 4. Denial of Leave to Amend
 
 61
 WestPoint appeals from the district court's denial of WestPoint's motion for leave to amend its answer in Krumme. WestPoint, pursuant to Fed.R.Civ.P. 15(a), moved to amend its answer to assert counterclaims against Krumme for, among other things, legal malpractice and breach of contract on the grounds that Krumme had solicited clients adverse to WestPoint on matters substantially related to Krumme's work for Cluett.[20] The district court denied Krumme's motion for leave to amend its answer, concluding that:
 
 
 62
 Contrary to Defendant's assertion, the proposed amendments are based on facts known to Defendant since 1989. Defendant has offered no adequate excuse for its delay in seeking to amend its answer. Moreover, it is readily apparent that the proposed amendments would require a new wave of discovery and would substantially delay the resolution of this action.
 
 
 63
 Krumme, 1996 WL 257633, at * 1 (S.D.N.Y. May 15, 1996). WestPoint argues that its new counterclaims would not have required extensive discovery and that its mere delay in moving to amend did not provide a sufficient basis for the district court's denial.
 
 
 64
 A decision to grant or deny a motion to amend is within the sound discretion of the trial court. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir.1994). It will not be overturned on appeal absent an abuse of discretion. See Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993). We have stated that "considerations of undue delay, bad faith, and prejudice to the opposing party [are] touchstones of a district court's discretionary authority to deny leave to amend." Barrows v. Forest Laboratories, 742 F.2d 54, 58 (2d Cir.1984) (footnote omitted); see Zahra v. Town of Southold, 48 F.3d 674, 686 (2d Cir.1995) (affirming denial of leave to amend after request filed two and one-half years after the commencement of action and three months prior to trial). "One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action." H.L. Hayden Co. v. Siemens Medical Systems, 112 F.R.D. 417, 419 (S.D.N.Y.1986) (collecting cases). Furthermore, "[a] proposed amendment ... [is] especially prejudicial ... [when] discovery had already been completed and [non-movant] had already filed a motion for summary judgment." Ansam Associates v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir.1985) (internal quotation marks and citation omitted).
 
 
 65
 Without considering the merits of WestPoint's proposed counterclaims, we affirm the district court's order denying the motion to amend. WestPoint knew of Krumme's retainer agreement with the Allen plaintiffs since March 1993. As Krumme's case was near resolution and discovery had been completed, the district court acted well within its discretion in concluding that WestPoint's new counterclaims would prejudice Krumme.
 
 CONCLUSION
 
 66
 In Allen, we affirm the district court's judgment in favor of defendants WestPoint, Dorsett and Roark. Because we conclude that the 9.3% PBGC-based rate was the proper rate at which to calculate the Allen plaintiffs' lump sums, we need not review the district court's decision with respect to the Allen plaintiffs' rescission and misrepresentation claims.
 
 
 67
 In Krumme, we affirm the district court's grant of summary judgment to Krumme on the issue of contract formation between Krumme and WestPoint and the district court's denial of WestPoint's motion for leave to amend. With respect to Krumme's breach of contract claim, we conclude that WestPoint is entitled to summary judgment to the extent that it argues that the 9.3% PBGC-based rate was the proper rate at which to compute the lump sum payments for EPI Amendment participants on April 5, 1989. We vacate the district court's judgment on the merits in Krumme and remand for further proceedings consistent with this opinion.
 
 
 68
 In both Allen and Krumme, we conclude that we have no jurisdiction to review the district court's award of attorney's fees and costs until the amount of those fees and costs have been set. We remand for the calculation of the plaintiffs' attorney's fees and costs in Allen and Krumme.
 
 
 
 *
 Honorable John S. Martin, Jr., United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The plaintiffs in Allen are Gordon E. Allen, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee (hereinafter the "Allen plaintiffs")
 
 
 [2]
 A "Change in Control" occurred if, among other things, "any individual, corporation, ... or other person ... is or becomes the Beneficial Owner of Securities of WestPoint representing twenty percent (20%) or more of the combined voting power of Westpoint's then outstanding securities." EPI Amendment § 4A. (1)(g)
 
 
 [3]
 Section 16 of the EPI Amendment provided, in pertinent part, that
 [i]f at any time upon or after a Change of Control there should arise any dispute as to the validity, interpretation or application of any term of condition of [the EPI Program], ... Cluett agrees, upon written demand by [a participant], ... to pay ... the [participant's] costs and reasonable attorneys' fees ... incurred by the [participant] in connection with any dispute or litigation, regardless of whether the [participant] is the prevailing party, involving any provision of [the EPI Program].
 EPI Amendment § 16.
 
 
 [4]
 The above-quoted actuarial assumptions in section 1.3 were added to the Cluett Plan on November 22, 1983 by Cluett's Board of Directors. The Cluett Board amended section 1.3 and specified the actuarial assumptions to comply with Revenue Ruling 79-90. See Rev. Rul. 79-90, 1979--1 C.B. 155 (requiring that defined benefit plans, that provide optional forms of benefits that are "actuarially equivalent" to normal benefits, "specif[y] [actuarial assumptions] within the plan in a manner which precludes employer discretion" and setting December 31, 1983 as the deadline for compliance) (codified at 26 U.S.C. § 401(a)(25) (1994)) (hereinafter "Revenue Ruling 79-90"). Prior to the Cluett Board's amendment, Section 1.3 had consisted of the above-quoted language in section 1.3 without the portion commencing with "the current factors being as specified below;" the Cluett Pension Plan Committee simply adopted actuarial assumptions without specifying them in the Cluett Plan
 
 
 [5]
 Section 11.1 provides, in pertinent part:
 The Board of Directors reserves the right at any time, and from time to time, to modify or amend in whole or in part any or all of the provisions of the [Cluett] Plan, but no such amendment shall substantially change the rights to benefits which, prior to such amendment, have become fixed or matured by retirement, termination or death.
 Cluett Plan § 11.1. Under section 9.1, the Cluett Board "ha[d] the sole authority to ... amend or terminate, in whole or in part, the [Cluett] Plan."
 
 
 [6]
 Section 9.6 states, in pertinent part, that the Cluett Committee has
 the exclusive right to interpret the Plan and to decide any matters arising thereunder in connection with the administration of the Plan.... Its decisions and the records of the Committee shall be conclusive and binding upon the Company, Participants, and all other persons having any interest under the Plan.
 The Committee shall adopt from time to time actuarial tables to be used as the basis for all actuarial calculations and shall determine from time to time the percentum rate or rates of interest to be used as the basis for calculations required in connection with the Plan. As an aid to the Committee, the Actuary appointed by the Committee shall make annual actuarial valuations of the assets and liabilities of the Plan and shall certify to the Committee the tables and rate or rates of interest which he would recommend for use by the Committee.
 Cluett Plan § 9.6 (emphasis added).
 
 
 [7]
 The release stated, in pertinent part:
 I understand that the lump sum payment of the actuarial equivalent of my deferred compensation benefit will be in full satisfaction of all obligations of West Point-Pepperell, Inc., as successor to Cluett, Peabody & Co., Inc., under the terms of my Deferred Compensation Agreement, and that in accepting a lump sum payment I shall thereby release West Point-Pepperell, Inc., its directors, officers, employees, and agents, and its successors and assigns, from all obligations under the Agreement.
 
 
 [8]
 The complaint also included a third claim for gross negligence and deceit on the theory that if the discount rate had in fact been 9.3% when Krumme executed the EPI Amendment, WestPoint had engaged in gross negligence and deceit by informing Krumme that the EPI Amendment incorporated a 5% discount rate. Krumme has abandoned this claim as the discount rate was indeed 5% at the time he executed the EPI Amendment
 
 
 [9]
 It is unclear from the record the date on which defendants first learned of Krumme's agreements with the Allen plaintiffs. The record indicates, however, that defendants knew of Krumme's agreement with the Allen plaintiffs at least as early as March 3, 1993, when Krumme testified in his deposition
 
 
 [10]
 The Allen plaintiffs alleged that defendants' misrepresentations included, inter alia, statements that (a) the discount rate was 9.3% when in fact the proper discount rate was 5%; (b) the change in control had occurred on April 5, 1989 when in fact, a change in control had occurred as early as November 21, 1988; (c) the Allen plaintiffs were "confused" and mistaken in their belief that a 5% discount rate had been incorporated into the EPI Amendment
 Furthermore the Allen plaintiffs alleged that defendants failed to disclose, among other things, that (a) the discount rate had been increased to 9.3% on February 16, 1989; and (b) the discount rate had been increased in an attempt to increase the attractiveness of WestPoint to a buyout group.
 
 
 [11]
 Specifically, the district court asked:
 May the parties take an immediate appeal where the District Court has found that one party has a contractual right to attorneys' fees and expenses, where all other issues going to the merits of the case have been resolved, and where all that remains for decision is the amount of such fees and expenses?
 
 
 [12]
 This opinion was later amended and reissued on February 11, 1997 to correct two minor textual errors. Inexplicably, it appears that only the pre-amended, January 28 opinion has been published in the Federal Supplement. We amend the two errors here (the page references are to Allen III, 954 F.Supp. 682 (S.D.N.Y.1997)):
 (1) on page 692, second column, sixteen lines down from the top of the page, the sentence is amended to read, "(5) that plaintiffs had the option of challenging....,"
 (2) on page 697, first column, nine lines down from the subsection V, Attorneys' Fees, the sentence beginning with "Defendants have announced their intention ...." is amended to read, "Defendant WestPoint has announced its intention to challenge this Court's determination that it must pay plaintiffs' attorneys' fees."
 
 
 [13]
 The Allen plaintiffs do not appeal the judgment in favor of defendants on their claims for breach of fiduciary duty and violation of New York labor law. We therefore deem these claims abandoned
 
 
 [14]
 WestPoint also argues that in the event we determine that the Cluett Committee had no authority under ERISA to adopt a new discount rate for the Cluett Plan, the Cluett Committee's action was voidable, not void ab initio, and therefore remained valid until successfully challenged by the plaintiffs. See Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 569 (7th Cir.1995) ("[T]echnical violations of ERISA ... do not justify relief absent a showing of bad faith, active concealment, or detrimental reliance."). Because we conclude that the Cluett Committee in fact had authority to adopt the 9.3% discount rate, we do not reach or consider this argument
 
 
 [15]
 For example, on April 24, 1989, WestPoint used a 5% discount rate in connection with calculating a lump sum payment for a retiring employee, Virginia Mansfield. This payment, unlike the one the Allen plaintiffs each received, was distributed pursuant to Ms. Mansfield's retirement under the Cluett Plan, not a change in control under the EPI Amendment
 In addition, after Cluett was sold to Bidermann Industries in 1990, TFP & C was replaced with a new actuary, The Wyatt Company, whose duties included the calculation of benefits due to Cluett employees under the Cluett Plan. Donald Parsons, Jr. of Wyatt, stated in an affidavit that as of January 1993 the discount rate contained in section 1.3 of the Cluett Plan was 5%.
 Furthermore, the Allen plaintiffs argue that if the discount rate in fact had been increased from 5% to 9.3%, they were entitled to, but never received, notice from WestPoint. See 29 U.S.C. § 1024(b)(1) (summary of a material modification to terms of plan must be furnished to plan participants no later than 210 days after the end of the plan year in which the modification is executed).
 
 
 [16]
 WestPoint also argues that the district court in Krumme wrongfully gave collateral estoppel effect to its conclusion in Allen II that the Cluett Committee had no authority under ERISA to change the discount rate and that it remained 5%. Because we conclude that the Committee had authority to adopt the 9.3% rate and vacate the district court's judgment in Krumme, we do not reach or consider this argument
 
 
 [17]
 We reject WestPoint's arguments that (1) because the Allen plaintiffs pleaded no ERISA law claim in the complaint, they are barred from pursuing a claim or remedy under ERISA; and (2) that because benefits due under a "top hat" plan (the EPI Program) are at issue, ERISA law is irrelevant to determine the Cluett Committee's authority to adopt actuarial factors. We adopt the district court's reasoning. See Allen II, 908 F.Supp. at 1221 (concluding, respectively, that (1) "[p]laintiffs do not pursue a claim or remedy under ERISA, but simply argue that ERISA's requirements are relevant to interpreting the terms of the [Cluett Plan] and EPI Amendment," and (2) that ERISA "indirectly affect[s] the EPI Amendment because [it] govern[s] the terms of the [Cluett Plan]")
 We also reject WestPoint's argument that, in light of the Cluett Committee's broad powers to interpret the Cluett Plan under section 9.6, the Cluett Committee's action is to be accorded deference. See Algie v. RCA Global Communications, 60 F.3d 956, 960 (2d Cir.1995) (affirming district court's conclusion that deference was not due to plan administrator on issue of whether severance plan was validly terminated under 29 U.S.C. § 1102(b)(3)).
 
 
 [18]
 The holdings in Alday and Coleman are not to the contrary. Those cases do not stand for the proposition that any change to the terms of a pension plan is valid only if effected pursuant to a plan's amendment procedures. In neither of those cases did the courts consider whether a specified plan term could be validly modified pursuant to an express plan provision that authorized changes by a process other than plan amendment
 
 
 [19]
 Plaintiffs offer the legal opinions of two actuaries, Steven Harrold and F. Thomas Senior, as support for its argument that Revenue Ruling 79-90 requires actuarial assumptions to be adopted pursuant to a plan's amendment procedures. We find these opinions unpersuasive
 
 
 [20]
 In light of our conclusion that the Cluett Committee had authority under ERISA to adopt new actuarial assumptions, we need not consider WestPoint's motion for leave to amend with respect to its proposed estoppel defense and counterclaims for rescission and reformation of the EPI Amendment